FILED
BRADFORD L. BOLTON

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

2002 DEC -6  PH 12: 43

|  |  |
|---|---|
| IN RE: | ) |
|  | ) |
| WINDSOR WOODMONT BLACK | ) |
| HAWK RESORT CORPORATION, | ) |
| a/k/a the Black Hawk Casino by Hyatt, | ) |
| a Colorado corporation, | ) |
|  | ) |
| EIN 75-2720870, | ) |
|  | ) |
|  | ) |
| Debtor. | ) |

DISTRICT OF COLORADO

Case No. 02-28089-ABC

Chapter 11

---

### MOTION FOR USE OF CASH IN ORDINARY COURSE OF BUSINESS AND
### FOR AUTHORITY TO USE CASH COLLATERAL

---

Comes now, Windsor Woodmont Black Hawk Resort Corporation, a Colorado corporation, debtor and debtor-in-possession in the above-captioned case (the "Debtor"), by and through its undersigned counsel, and, pursuant to 11 U.S.C. §§ 363(c)(1) and 552(a), requests that the Court find that cash consisting of post-petition revenues from the Debtor's casino operations (the "Post-Petition Cash") does not constitute cash collateral and may therefore be used by the Debtor in the ordinary course of business without notice or hearing.[1] Alternatively, to the extent that the Court finds that the Post-Petition Cash constitutes cash collateral, the Debtor requests, pursuant to 11 U.S.C. § 363 and Rule 4001 of the Federal Rules of Bankruptcy Procedure, that the Court enter an order authorizing the Debtor to use cash collateral in accordance with the budget (the "Budget") attached hereto as Exhibit "A" (not to exceed 10% above each budgeted category, calculated on a monthly basis) on the grounds that such expenditures are normal operating expenses and are necessary to manage and preserve the property of the Debtor's estate. In addition, with respect to cash consisting of pre-petition revenues from the Debtor's casino operations (the "Pre-Petition Cash"), the Debtor requests that the Court enter an order authorizing the Debtor to use the Pre-Petition Cash in accordance with the Budget (not to exceed 10% above each budgeted category, calculated on a monthly basis) on the same grounds stated above. The Pre-Petition Cash and the Post-Petition Cash shall be collectively referred to herein as the "Cash."

---

[1]     While the Debtor believes that it is entitled to use the Post-Petition Cash without notice and hearing pursuant to 11 U.S.C. § 363(c)(1), at least one of the Debtor's secured lenders has taken the position that it has a perfected security interest in the Cash. Accordingly, in an abundance of caution, the Debtor filed this Motion seeking a determination that the Post-Petition Cash is not cash collateral.

# I.
# FACTUAL BACKGROUND

## A. The Debtor's Business

The Debtor is the developer and owner of the Black Hawk Casino by Hyatt (the "Casino") located in Black Hawk, Colorado. The Casino, which opened for business on December 20, 2001, is an upscale, integrated limited stakes gaming casino, entertainment and parking facility. The Casino is the largest casino in Black Hawk, with approximately 425,000 square feet, 57,000 of which is used for gaming. The Casino also features more gaming machines than any other casino in Black Hawk with approximately 1,180 state of the art slot machines and 20 table games. The interior decor of the Casino resembles the Rocky Mountain surroundings by using rocks, wood, and landscapes natural to Colorado as part of the interior design.

The Casino provides patrons with a broad selection of gaming activities, lounges, dining options, and entertainment areas. The dining options at the Casino range from a steak house to a high quality buffet, and include a food court featuring various quick service food offerings. The Casino has an approximately 300,000 square foot parking garage, with the capacity to park approximately 800 vehicles in covered parking spaces. It also has 650 adjacent valet spaces, and is able to accommodate buses and motor coaches.

The Casino is operated and managed by Hyatt Gaming Management, Inc. ("Hyatt") pursuant to a professional management agreement. Hyatt has been responsible for implementing all operational and strategic initiatives since the Casino opened. The Casino utilizes approximately 600 local employees, who are all technically Hyatt employees pursuant to the management agreement with Hyatt.

The Debtor's workforce is comprised of three individuals in executive management positions. The Debtor's personnel provide oversight of Hyatt's performance under the management agreement and all operational performance issues at the Casino. This oversight requires, among other things, (1) regular communication with Hyatt regarding Casino operations, (2) weekly meetings between the Debtor and Hyatt regarding marketing programs, payroll management, food and beverage operations, slot operations and guest services, and (3) regular communication with Hyatt regarding the monthly financial reports required under Hyatt's management agreement.[2] The Debtor's personnel also address

---

[2]    The Debtor has made several recommendations based on its concerns regarding Hyatt's operation of the Casino. These recommendations have included, among other things, (1) downsizing personnel to reduce costs in light of the lower than expected numbers of customers at the Casino, (2) reducing the slot machine hold percentage, which is over 20% higher than the competition and which has resulted in a negative perception of the Casino among potential customers, (3) reducing the percentage of participation games (leased equipment that requires that revenue be shared with the lessor) which have not been profitable for the Casino, and (4) focusing marketing efforts based on demographics, promotion of individual winners and promotion of the Casino's advantage in its gaming

regulatory compliance issues for the Casino, including the preparation of all SEC filings, IRS filings and other financial reports, and the preparation of reports to and communication with the Colorado Division of Gaming. In addition, the Debtor's personnel work with the city and the Colorado Gaming Association in efforts to improve future profitability of the Casino (e.g. expanding hours of operations, raising bet limits, improving infrastructure to allow greater public access to the Casino, etc.). The Debtor's personnel also provide oversight for legal work related to the operation of the Casino (e.g. title defense, construction issues, gaming license issues, etc.). Moreover, one of the Debtor's employees, whose cost is partially funded by Hyatt, serves as the facilities manager of the Casino and provides engineering and building maintenance services.

The Debtor generated revenues (net of payments of winnings to players at the Casino) of approximately $51.7 million from the operation of the Casino for the nine months ended September 2002. These revenues were generated primarily through the Casino's gaming, food and beverage operations. At the month ending September 31, 2002, the Debtor had consolidated assets of approximately $139.5 million and consolidated liabilities of approximately $152.7 million. As of November 8, 2002, the Debtor's assets and liabilities remained substantially unchanged.

## B. The Debtor's Bankruptcy Filing

Several factors contributed to the Debtor's current financial crisis and impaired its profitability. The Debtor's financial difficulty is caused primarily by the Casino's inability to deliver projected gaming revenues or at least achieve industry standard operating and profit margins after the Casino opened 10 months ago and Hyatt's failure to adjust the operation and expenses at the Casino to be appropriate to the Casino's actual level of patronage and gross revenues. This failure of Hyatt to react appropriately to the actual operational and revenue level of the Casino, as opposed to the levels upon which Hyatt's expense and operational budget was based, has resulted in the Casino's net margin being substantially lower than the net margins of the similarly situated and competing casinos in Black Hawk. Even at the current actual revenue levels, if the net margin of the Casino equaled the net margins of the Casino's competitors, and the management fee payable to Hyatt was eliminated, the Debtor would not be in financial difficulty. This will be accomplished once the Hyatt agreement is rejected and the Debtor assumes direct operational control of the Casino.

---

products. Hyatt has either failed to implement, or has been extremely slow in responding to, these recommendations despite the fact that Hyatt's operating forecast and budget for the Casino was based on projected net revenues that were 60.17% higher than the actual revenues earned at the Casino. Given these issues, the Debtor is planning to reject the management agreement with Hyatt. If the Debtor rejects the management agreement with Hyatt, the Debtor's employees will be required to transition new management and, in all probability, manage operations until the transition is complete. Once the Hyatt management agreement has been terminated, the Debtor's personnel will have the responsibility of directly managing and operating the Casino.

Case:02-28089-ABC   Doc#:50   Filed:12/06/02   Entered:12/09/02 13:47:37   Page4 of 13

In addition, the resulting financial performance is attributable to significant turnover in senior management (of Hyatt employees), poor service relating to slot machines, a misdirected marketing focus on the lowest-yield segments of the potential gaming market, untimely and unresponsive decision making, the overall perception of poor slot payoffs by core Black Hawk gaming enthusiasts, and the failure to adapt to changing circumstances directly impacting the gaming industry generally and Colorado gaming in particular.

Although the Debtor believes that its casino business will be restructured and will emerge from this bankruptcy as a profitable enterprise, the problems set forth above resulted in unanticipated decreases in revenue and increases in expenses which led the Debtor to file the Chapter 11 petition herein on November 7, 2002 (the "Petition Date").

## C. Summary of Secured Indebtedness

Prior to the commencement of its Chapter 11 case, the Debtor entered into secured loan agreements with the following lenders:

### 1. Wells Fargo Bank

On October 2, 2001, Wells Fargo Bank,[3] as the administrative and collateral agent for a consortium of lenders (collectively, "Wells Fargo"), made a loan to the Debtor in the original principal amount of $20.8 million for the purpose of acquiring furniture, fixtures and equipment to be used in connection with the development and operation of the Casino (the "FF&E Loan"). The FF&E Loan is secured by all of the furniture, fixtures and equipment (including gaming equipment) (the "FF&E") purchased with the FF&E Loan proceeds. The FF&E Loan security interest likewise extends to all proceeds and products of the FF&E, but specifically excludes gaming revenues realized from the use and operation of the gaming equipment. As of the Petition Date, the balance on the FF&E Loan was approximately $17,806,644.18, including accrued interest. The maturity date of the FF&E Loan is January 1, 2005.

The FF&E Loan documents include the following (true and correct copies of which are attached hereto as Exhibits "B" through "D"):

| | |
|---|---|
| **Exhibit B:** | Promissory Note, dated October 2, 2001, in the face amount of $20.8 million. |
| **Exhibit C:** | Security Agreement, dated October 2, 2001, granting the FF&E lenders a security interest in the FF&E. |
| **Exhibit D:** | FF&E Financing Statements, filed in the offices of the (i) Clerk and Recorder of Gilpin County, Colorado; and (ii) Colorado Secretary of State. |

---

[3]   The Debtor is informed and believes that David R. Belding purchased 100% of the outstanding interests in the FF&E Loan.

## 2. SunTrust Bank as Trustee for the Bondholders

On March 14, 2000, the Debtor and SunTrust Bank, a Georgia banking corporation, as trustee ("SunTrust"), entered into an Indenture, pursuant to which the Debtor issued its 13% First Mortgage Notes with a maturity date of March 15, 2005, in the aggregate principal amount of $100 Million (the "First Mortgage Notes"). The First Mortgage Notes state that they are secured by a first priority lien on substantially all of the Debtor's assets, but specifically exclude, among other things, (1) the FF&E acquired under the FF&E Loan[4], (2) Gaming Licenses, (3) Liquor Licenses, and (4) gaming devices (only to the extent that gaming laws prohibit the granting of a security interest). As of the Petition Date, the balance on the First Mortgage Notes was approximately $107,622,022.60, including accrued interest and unamortized loan discount.

The Indenture documents include the following (true and correct copies of which are attached hereto as Exhibit "E" through "H"):

**Exhibit E:**  Security Agreement, dated March 14, 2000.

**Exhibit F:**  Deed of Trust to Public Trustee, Security Agreement, Fixture Filing and Assignment of Rents, Leases and Leasehold Interests (Beneficiary is SunTrust Bank, as Trustee), recorded in the Office of the Clerk and Recorder of Gilpin County, Colorado.

**Exhibit G:**  Indenture Financing Statements, filed in the offices of the (i) Clerk and Recorder of Gilpin County, Colorado; and (ii) Colorado Secretary of State.

**Exhibit H:**  Indenture UCC Subordination Statements including Statements filed on October 23, 2001, in the offices of the (i) Clerk and Recorder of Gilpin County, Colorado; and (ii) Colorado Secretary of State.

## 3. Hyatt

On March 14, 2000, Hyatt made a loan to the Debtor in the original principal amount of $7.5 million for the purpose of financing a portion of the construction and development of the Casino (the "Second Mortgage Note").[5] The Second Mortgage Note states that it is secured by a second priority lien on the assets securing the First Mortgage Notes. As of the Petition Date, the balance on the Second Mortgage Note was approximately $10,740,520.41,

---

[4]     Pursuant to the terms of the subject Deed of Trust, the FF&E becomes part of the collateral securing the First Mortgage Notes once the FF&E Loan has been repaid, satisfied or terminated.

[5]     Of the proceeds from the issuance of the Second Mortgage Notes, $5.2 million were deposited in a construction disbursement account and $0.7 million were deposited in a completion reserve account.

including accrued interest and unamortized loan discount. The maturity date of the Second Mortgage Note is March 15, 2010.

The Hyatt Security documents include the following (true and correct copies of which are attached hereto as Exhibits "I" through "M"):

**Exhibit I:** Subordinated Promissory Note, dated March 14, 2000, in the face amount of $7.5 million.

**Exhibit J:** Hyatt Security Agreement, dated March 14, 2000.

**Exhibit K:** Deed of Trust to Public Trustee, Security Agreement, Fixture Filing and Assignment of Rents, Leases and Leasehold Interests (Beneficiary is Hyatt Gaming), recorded in the Office of the Clerk and Recorder of Gilpin County, Colorado.

**Exhibit L:** Hyatt Financing Statements, including Statements filed in offices of the (i) Clerk and Recorder of Gilpin County, Colorado; and (ii) Colorado Secretary of State.

**Exhibit M:** Hyatt UCC Subordination Statements including Statements filed on October 23, 2001 in the offices of the (i) Clerk and Recorder of Gilpin County, Colorado; and (ii) Colorado Secretary of State, for the purpose of providing record notice that the security interest perfected by the Hyatt Financing Statements is subordinate to the security interest perfected by the FF&E Loan Financing Statements.

Wells Fargo, SunTrust and Hyatt shall collectively be referred to as the "Secured Creditors."

## D. Summary of the Debtor's Post-Petition Cash Needs

The Budget provides a detailed list of various categories of expenses that represent the normal business expenses for operation and management of the Casino for the four months ending February 2003. The Budget includes line items for, among other things, personnel, gaming taxes, device fees, the cost of goods sold, insurance, utilities, the management fee for Hyatt, and corporate costs. Corporate costs include (1) legal expenses and oversight related to the operation of the Casino (e.g. real property title defense, construction issues, gaming license issues, etc.), (2) the cost for a facilities manager who provides engineering and building maintenance services, and (3) overhead and labor expenses for the Debtor's personnel who prepare all SEC filings, IRS filings and other financial reports, address regulatory compliance issues with the Colorado Division of Gaming, work with the city and the Colorado Gaming Association to improve the future profitability of the Casino, review and analyze monthly financial reports required under the management agreement with Hyatt, provide necessary financial and accounting services, and manage and provide oversight for Hyatt's activities and the operation of the Casino. The

- 6 -

Debtor's oversight and management of Hyatt's performance under the management agreement is essential given that the Debtor, unlike Hyatt, has a fiduciary duty to all creditors to maintain and protect the property. The Budget does not include any direct expenses related to the administration of the Chapter 11 estate, but does provide for the continued employment by the Debtor's management which, among other things, provides the necessary interface with and reporting to the Office of the United States Trustee. The Debtor's bankruptcy counsel has asked the Court to authorize the payment of the Debtor's professionals' costs and a portion of accruing fees on a monthly basis. If the Court authorizes the payment of such fees and costs from the Debtor's post-petition revenues, the Budget will be amended to provide for these fees and costs.

The Cash is revenue from the operation of the Casino. The revenue is generated primarily through the Debtor's gaming, food and beverage operations. As evidenced by the projections in the Budget, the monthly revenue of the Casino is more than sufficient to cover the Debtor's operating expenses. Without the use of the Cash, the Debtor will not have sufficient funds to meet its operating expenses and will be unable to continue its casino operations in the ordinary course of business.

## II.

## THE DEBTOR SHOULD BE AUTHORIZED TO USE THE POST-PETITION CASH IN THE ORDINARY COURSE OF BUSINESS WITHOUT NOTICE AND HEARING BECAUSE THE POST-PETITION CASH IS PROPERTY ACQUIRED BY THE DEBTOR AFTER THE COMMENCEMENT OF THE CASE AND IS THEREFORE NOT CASH COLLATERAL

Pursuant to Section 363(c)(1) of the Bankruptcy Code, the Debtor should be authorized to use the Post-Petition Cash in the ordinary course of business without notice and hearing because the Post-Petition Cash is not subject to any valid security interest. Section 552(a) of the Bankruptcy Code states the general rule that "[e]xcept as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." Section 552(a) prevents pre-petition security interests from attaching to property acquired by the debtor post-petition and "was drafted to facilitate the debtor's fresh start by not subjecting property acquired post-petition to a pre-petition security agreement." In re Investment Hotel Properties, Ltd., 109 B.R. 990, 995 (Bankr. D. Colo. 1990); In re Bering Trader, Inc., 944 F.2d 500, 502 (9th Cir. 1991) (Section 552(a) "intended to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors").

Section 552(b) of the Bankruptcy Code provides a "narrow exception" to the general rule of Section 552(a). Bering, 944 F2d at 502. Section 552(b)(1) provides that, if a creditor has a security interest in property acquired by the debtor before the commencement of the case "and to proceeds, product, offspring, or profits of such property, then such security interest extends to such proceeds, product, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law." Section 552(b)(2) provides an additional exception to the

-7-

general rule of Section 552(a). It provides that if a creditor has a security interest in property acquired by the debtor pre-petition "and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided by such security agreement." Importantly, the secured party bears the burden of proving that its pre-petition lien extends to post-petition property acquired by the debtor. 5 Collier on Bankruptcy, ¶ 552.01[4] (15th Ed. Rev. 2000); In re Lykes Bros. Steamship Co., Inc., 216 B.R. 856, 863-864 (Bankr. M.D. Fla. 1996).

In short, to come within the narrow exceptions of Section 552(b)(1) or (2), the secured party must establish that the post-petition revenue is directly attributable to a pre-petition asset on which the creditor has a valid security interest and that the post-petition revenue is the proceed, product, offspring, rent, or profit of such asset. As set forth below, applicable law and the facts and circumstances of this case make clear that this burden cannot be satisfied.

First, to the extent that one or more of the Secured Creditors has valid liens on personal property of the Debtor, such as the Debtor's accounts or general intangibles, none of the Secured Creditors could have a security interest in the Post-Petition Cash because Section 552(b)(1) only provides an exception to the general rule invalidating liens on after acquired property for the proceeds, product, or profits of pre-petition property. If, as is the case here, the accounts or general intangibles that give rise to the Post-Petition Cash come into existence after the petition is filed, the revenue is attributable to post-petition property and is therefore not cash collateral. Investment Hotel Properties, 109 B.R. at 994-995 (holding that security interests in post-petition accounts are invalidated by Section 552); see In re Wallman, 71 B.R. 125, 128 (holding that security interest in crops did not extend to crops planted post-petition because "proceeds" exception only refers to proceeds generated by pre-petition collateral, not to proceeds of property acquired post-petition).

Proceeds of post-petition accounts or personal property "do not fall within the Section 552(b) proceeds exception because there is no interest in the right, in the account receivable, created pre-petition where it is only post-petition acts which generated that account receivable."[6] In re HRC Joint Venture, 175 B.R. 948, 953 (Bankr. S.D. Oh. 1994). Accordingly, courts have held that the proceeds of such post-petition accounts or personal property are not cash collateral because they do not arise from the mere existence of any pre-petition asset. HRC, 175 B.R. at 953 (holding that creditor's security interest in monthly remittances paid to debtor under property management agreement arose each month and were cut off as of the date of the bankruptcy filing pursuant to Section 552); Investment

---

[6]     Arguably, a secured creditor with a lien on contract proceeds would be entitled to proceeds from the post-petition liquidation of a pre-petition contract. However, the contract formed by a wager (if not simply "money") or restaurant order arises when the order or wager is placed. Consequently, no pre-petition collateral is implicated and no cash collateral is created from the liquidation (collection) of the post-petition contract.

Hotel Properties, 109 B.R. at 995 - 997 (holding that revenue generated post-petition was not subject to a creditor's pre-petition security interest because such revenue did not exist as of the date of the petition).

The Post-Petition Cash is post-petition revenue from the Casino's post-petition food, beverage and gaming operations to which Section 552(a) clearly applies. Gaming revenue is either (1) "money" that comes into being when a customer places a wager, or (2) the proceeds of a gaming or aleatory contract which, under the Uniform Commercial Code, would be an "account" or "general intangible." Regardless of its characterization as money, accounts or even general intangibles, the Post-Petition Cash and the underlying money, account or general intangible only come into existence when the Debtor's customers spend money at the Casino's restaurants or place a wager at a gaming table or machine. It does not implicate any pre-petition collateral because the customer is under no pre-petition obligation to wager or dine at the Casino. Simply put, since these moneys, accounts or general intangibles arise post-petition and do not arise from the mere existence of pre-petition assets on which the Secured Creditors has a lien, the Secured Creditor's pre-petition security interest in assets of this type, if any, does not extend to the Post-Petition Cash under the narrow exception provided by Section 552(b)(1) because the Post-Petition Cash is not the proceeds, product, or profit of any pre-petition collateral.

Second, to the extent that one or more of the Secured Creditors has a valid security interest in the Debtor's real property and the proceeds, product, offspring, rents or profits of such real property, the Post-Petition Cash, which consists of post-petition revenue from the Casino's food, beverage and gaming operations, is not cash collateral because it is not "amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties."

Under similar facts, even where the secured creditor has established a valid lien on the debtor's real property and the rents, issues and profits therefrom, courts interpreting Section 552(b)(1) and (2) have found that the secured creditor's pre-petition lien does not extend to the business receipts derived from post-petition services provided by the Debtor. For example, Courts have held that post-petition revenues generated by restaurants, retail establishments, bowling alleys and race tracks are not subject to any pre-petition security interest in real property rents, issues or profits because they "[are] not proceeds of the property but [are] the result of services provided by the business." See, e.g., In re Zeeway Corp., 71 B.R. 210, 211 (Bankr. 9th Cir. 1987) (holding that raceway gate receipts were derived from debtor's business operations and were not cash collateral); In re Corner Pockets of the Southwest, Inc., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (holding that restaurant and entertainment revenue was not cash collateral because it was the product of debtor's services, not real property); In re Countryside Bowling Center, Inc., 203 B.R. 765, 766 (Bankr. M.D. Fla. 1996) (holding that creditor with security interest in real property, furniture, fixtures and equipment did not have security interest in post-petition revenues of bowling alley and that such funds were not cash collateral).

Similarly, the Court in In re GGVXX, Ltd., 130 B.R. 322, 326 (Bankr. D. Colo. 1991), held that post-petition golf course revenue derived from greens fees, cart fees, club rentals and range ball sales was not cash collateral because it was "best and most accurately characterized as business receipts or personal property and not rental payments which are directly tied to and wholly dependent upon the use of the real property upon which the business is conducted." Gaming revenues, like revenue generated from restaurants, bowling alleys, golf courses and race tracks, are clearly the product of services provided by the Debtor and are, therefore, not the proceeds, product, offspring, rents, or profits of the Debtor's real property.[7]

Since the Post-Petition Cash is the product of post-petition services provided by the Debtor and could only be attributed to property acquired by the Debtor after the commencement of the case, the Post-Petition Cash is not subject to the exceptions to the general rule of Section 552(a) that pre-petition security interests do not extend to property acquired by the estate after the filing of the petition. Accordingly, the Debtor should be allowed to use the Post-Petition Cash in the ordinary course of business without notice or hearing.

### III.

### ALTERNATIVELY, THE DEBTOR SHOULD BE AUTHORIZED TO USE THE POST-PETITION CASH IN ACCORDANCE WITH THE BUDGET BECAUSE SUCH EXPENDITURES REPRESENT THE NORMAL BUSINESS EXPENSES OF THE DEBTOR IN OPERATING AND MANAGING THE CASINO

Even if the Court were to determine that the Post-Petition Cash is cash collateral, the Debtor should be authorized to use the Cash in accordance with the Budget (not to exceed 10% above each budgeted category, calculated on a monthly basis) because the expenditures estimated in the Budget represent the normal operating and management costs for the Casino. As previously stated, the Budget may ultimately include interim payments of the costs, and a portion of the fees, of the Debtor's bankruptcy counsel and financial advisors.

Once a bankruptcy case is filed, a debtor in possession has duties and responsibilities similar to those of a state court receiver and is entitled to use the cash proceeds from secured property to pay normal operating expenses, including management costs and costs related to the preservation and maintenance of the property. In re Morning Star Ranch Resorts, 64 B.R. 818, 822-823 (Bankr. D. Colo. 1986); see In re Lederman Enterprises, Inc., 106 B.R.

---

[7]     The Secured Creditors cannot avail themselves of the other prong of Section 552(b)(2) which preserves the post-petition effect of security interests in "fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties" because this section was specifically designed to protect hotel and motel revenues which were pledged to secure loans to hotels and/or lodging accommodations. The Debtor does not operate or own a hotel, motel or lodging property. To equate revenues from the operation of other types of business to hotel and motel revenue "would be an unwarranted extension of the scope of cash collateral." Countryside Bowling, 203 B.R. at 766; Lykes Bros., 216 B.R. at 864.

674, 681-682 (Bankr. D. Colo. 1989) (debtor in possession was entitled to use cash to operate hotel and pay management costs and secured creditor only entitled to adequate protection for use of cash collateral beyond these amounts). In Morning Star, the court held that the costs of management and preservation of a motel resort could include the costs of utilities, cleaning services, labor (for reservations, check in, cashiers, accounting etc.), fees for the receiver's services, fees for the services of a management company, and fees for accountants and attorneys (not related to the administration of the debtor's bankruptcy case). Morning Star, 64 B.R. at 822. Administrative costs for the Debtor's bankruptcy case are payable from cash collateral only with the consent of any creditor holding a security interest in the cash collateral or upon appropriate order of the Bankruptcy Court.

In the instant case, the Debtor should be allowed to use the Post-Petition Cash to the extent the expenditures do not exceed 10% of the amounts outlined in the Budget because the expenses outlined therein represent the normal costs of managing and operating the Debtor's business and are consistent with the type of expenses approved by the court in Morning Star. The Budget includes expenses for normal operating costs such as labor, gaming taxes, device fees, the cost of goods sold, insurance, and utilities. The Budget also includes normal management expenses such as (1) the fee for Hyatt, and (2) the "corporate costs" outlined above. Approval of the expenses associated with the oversight and management of Hyatt and the Casino by the Debtor's employees is especially warranted because, unlike Hyatt, the Debtor functions like a receiver. As in Morning Star, the Debtor has a duty to all creditors to maintain and protect the property. Hyatt has no such direct duty and, indeed, has separate interests as a contract party, purported secured creditor, and as the "day to day" manager of the Casino. Furthermore, once the Hyatt management agreement has been rejected, the Debtor's personnel will be needed to manage and operate the Casino.

Moreover, to the extent that the Bankruptcy Court authorizes interim payments of the Debtor's bankruptcy counsel and other professionals from the Debtor's post-petition revenue and to the extent that such revenue even constitutes cash collateral, those payments represent an appropriate use of the Debtor's cash collateral.

## IV.
## THE DEBTOR SHOULD BE AUTHORIZED TO USE THE PRE-PETITION CASH IN ACCORDANCE WITH THE BUDGET BECAUSE SUCH EXPENDITURES REPRESENT THE NORMAL BUSINESS EXPENSES OF THE DEBTOR IN OPERATING AND MANAGING THE CASINO

The Debtor should be authorized to use the Pre-Petition Cash in accordance with the Budget (not to exceed 10% above each budgeted category, calculated on a monthly basis) on the same grounds stated in section III. above: namely, that the expenditures estimated in the Budget represent the normal operating and management costs for the Casino and are consistent with the type of expenses approved by the court in Morning Star.

- 11 -

## V.
## CONCLUSION

Based on the foregoing, the Debtor respectfully requests that the Court find that the Post-Petition Cash is not subject to any security interest and authorize the Debtor to use the Post-Petition Cash in the ordinary course of business without notice and hearing. Alternatively, to the extent that the Court finds that the Post-Petition Cash is cash collateral, the Debtor respectfully requests that the Court authorize the Debtor to use the Post-Petition Cash pursuant to the Budget (not to exceed 10% above each budgeted category, calculated on a monthly basis). Finally, with respect to the Pre-Petition Cash, the Debtor respectfully requests that the Court authorize the Debtor to use the Pre-Petition Cash pursuant to the Budget (not to exceed 10% above each budgeted category, calculated on a monthly basis).

Dated: 12/5/02                         Respectfully Submitted,

                                       RUBNER PADJEN AND LAUFER LLC


By:

                                       Paul D. Rubner, Esq. (#1261)
                                       Joel Laufer, Esq. (#7728)
                                       Robert Padjen, Esq. (#14678)
                                       Attorneys for Debtor and Debtor-in-Possession
                                       1600 Broadway, Suite 2600
                                       Denver, Colorado 80202
                                       Telephone (303) 830-3172
                                       Facsimile (303) 830-3135

                                       and

                                       IRELL & MANELLA LLP
                                       William N. Lobel, Esq. (Cal. Bar # 093202)
                                       Jeffrey M. Reisner, Esq. (Cal. Bar # 143715)
                                       Attorneys for Debtor and Debtor-in-Possession
                                       840 Newport Center Drive, Suite 400
                                       Newport Beach, California 92660
                                       Telephone (949) 760-0991
                                       Facsimile (949) 760-5200

UNITED STATES BANKRUPTCY COURT

DISTRICT OF COLORADO

# Notice of Limited Availability of Electronic Document

NOTICE IS HEREBY GIVEN that the following exhibit, attachment, or supporting document contains additional pages that have not been scanned or otherwise converted to an electronic format. These additional pages do not appear as a continuation of this document. Pursuant to the Administrative Procedures for Electronic Case Files promulgated by the Court in General Procedure Order 2001-8, these additional pages may not be retained in the electronic case records.

To view the additional pages in this document, please see the paper case file record.

FOR THE COURT

Bradford L. Bolton, Clerk

1/16/02