IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

FILED
BRADFORD L. BOLTON, CLERK

DEC 19 2002

U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| WINDSOR WOODMONT BLACK HAWK | ) |
| RESORT CORPORATION; | ) |
| TAX ID: 75-2720870 | ) Case No. 02-28089 ABC |
| | ) |
| Debtor. | ) |

---

## FIRST MORTGAGE NOTEHOLDERS' OBJECTION TO DEBTOR'S MOTION FOR USE OF CASH IN ORDINARY COURSE OF BUSINESS AND FOR AUTHORITY TO USE CASH COLLATERAL

---

Ableco Finance, LLC, Farallon Capital Management, Credit Suisse Fixed Income, Credit Suisse Leveraged Investments, Highland Capital Management, MW Post Advisory Group, Trust Company of the West, and Libra Securities (collectively, "First Mortgage Noteholders") object to Debtor's Motion for Use of Cash in Ordinary Course of Business and for Authority to Use Cash Collateral. As grounds for their Objection, First Mortgage Noteholders respectfully state as follows:

### I. THE FIRST MORTGAGE NOTEHOLDERS

On March 14, 2000, the Debtor sold $100 million in first mortgage notes to various note holders. The First Mortgage Noteholders hold approximately $94 million in principal amount of the notes.

Documents securing these notes (the "Security Documents") all recite that they are for the benefit of the Noteholders as well as the Indenture Trustee, Sun Trust Bank. The First Mortgage Noteholders have a security interest in essentially all assets of the Debtor. The Security Documents describe potentially excluded assets as follows:

> Notwithstanding the foregoing, the Trust Property shall not include
> any of the following assets (the "Excluded Assets"): (A) Gaming

Licenses, (B) Liquor Licenses, (C) all gaming devices, other licenses or permits and any interest in such gaming devices, licenses or permits to the extent (but only to the extent) that the Gaming Laws or Liquor Laws, as applicable, prohibit, as of the date hereof, the Debtor from granting a security interest therein without the approval of the ` Gaming Authority or Liquor License Authority (but only to the extent such approval has not been obtained), (D) FF&E to the extent that (1) the purchase or lease of such FF&E is not financed with the proceeds of the Notes but with the proceeds of an FF&E Financing and (2) the Debtor is permitted to enter into such FF&E Financing for such FF&E under the Indenture and (E) the Hyatt Intellectual Property, the Protected Marks and the Protected Name; provided, however, that (x) any such Excluded Asset now owned or hereafter acquired by the Debtor shall automatically become part of the Collateral when and to the extent it may subsequently be made subject to such a lien and/or such approval of the Gaming Authority or Liquor License Authority, as applicable, is obtained and/or such FF&E Financing has been repaid, satisfied or terminated and (y) all proceeds of any Excluded Assets shall be subject to the continuing security interest granted hereunder to the full extent permitted under applicable Gaming Laws or Liquor Laws or the terms of the FF&E Financing; further provided, however, that the security interest granted herein in the Hyatt Gaming Accounts shall be subordinated to the lien of Hyatt Gaming in such accounts to the extent, but only to the extent, set forth in the Intercreditor Agreement. (Emphasis added.)

Any apparent exclusions, however, are negated by their exceptions and thus generally do not apply. For example, there is no prohibition in Colorado for a security interest on gaming devices and the Debtor does not claim any such prohibition in its papers. Moreover, the FF&E remains encumbered by the Security Documents because it was "subsequently . . . made subject to such a lien" as a Permitted Encumbrance under the Wells Fargo documents and a subordinated financing statement. Consequently, the First Mortgage Noteholders have a security interest in virtually all the Debtor's assets. That interest is a first priority generally, and a second priority behind Wells Fargo on certain assets.[1]

---

[1] The Wells Fargo interest excludes the revenues from the gaming devices and thus the First Mortgage Noteholders remain in first position on the Debtor's cash.

2

Doc# 1712152\2

The financing contained an interest reserve which made semi-annual payments until September of 2002 when the Debtor was obligated to make its first out of pocket payment. Debtor defaulted and has never made any out of pocket payments on this obligation. According to the Debtor's Schedules, the First Mortgage Noteholders (exclusive of accruing interest and fees) hold approximately 70% of the Debtor's total debt.

## II. THE RELIEF SOUGHT BY THE DEBTOR AND THE FIRST MORTGAGE HOLDERS' RESPONSE

Debtor refers to pre-petition cash and post-petition cash without defining either, other than referring to them as pre-petition and post-petition revenues. But, because the Debtor concedes that the pre-petition cash is subject to security interests and because §363(c)(4) of the Bankruptcy Code requires Debtor to segregate and account for cash collateral in its possession, Debtor should be required to identify the account(s) in which the cash collateral has been segregated, the amount in those accounts, and how the cash collateral was calculated.[2]

Debtor seeks court authorization to use post-petition cash, contending that (i) such cash is property it acquired after commencement of the case, and (ii) pursuant to §552 of the Bankruptcy Code, is free from any security interest. Conceding the attachment of perfected security interests to the pre-petition cash, Debtor also seeks permission to use that cash pursuant to a budget without providing any adequate protection or meeting the other strictures of §363. It argues merely that the budgeted use represents normal costs of managing and operating the Debtor's business, consistent with expenditures authorized in *In re Morning Star Ranch Resorts*, 64 B.R. 818 (Bkrtcy.D.Colo. 1986).

The First Mortgage Noteholders do not object to the use of post-petition cash to pay the operating budget items contained on Exhibit A through the OPERATING INCOME line. These are the expenditures being made by Hyatt Gaming Management pursuant to its Management

---

[2] Of course, because all of the cash is subject to security interests for the benefit of the First Mortgage Noteholders as shown herein, the need to differentiate between pre- and post-petition cash evaporates although the Debtor is still required to segregate the same and not use any of the cash until it has obtained either the consent of the holders of the security interests or a court order authorizing the use of the cash collateral.

3

Doc# 1712152\2

Contract with Debtor. They represent approximately 97% of the average monthly expenditure authorization sought by the Debtor, and are the real monies used to operate and preserve the property encumbered by the Security Documents. Indeed, Debtor's footnote 1 to that budget states that the budget has been prepared by Hyatt Gaming, which is in "complete control of operations under the terms of the Management Contract in place at this time."

But, the First Mortgage Noteholders do specifically object to the line item CORPORATE COSTS (the penultimate line on the operating budget) as those costs are detailed on the PROJECTED OWNER OPERATING COSTS contained on Exhibit A. The Debtor's proposed use of "Corporate Costs" and "Projected Owner Operating Costs" are not necessary for the operation or preservation of the casino. They are an attempt by the Debtor to pay for ordinary corporate expenses or restructuring expenses that are not necessary to preserve the collateral. Debtor should be required to comply with 11 U.S.C. §363(c) before any such use is authorized by this Court.

Under applicable Colorado law the security interests reach all of the Debtor's cash, both pre- and post-petition. Furthermore, 11 U.S.C. §552 does not change this result. Finally, Debtor should be required to segregate and account for all cash collateral as required by 11 U.S.C. §363(c)(4).

### III.   THE SECURITY INTERESTS HELD BY SUN TRUST BANK FOR THE BENEFIT OF THE FIRST MORTGAGE NOTEHOLDERS REACH THE DEBTOR'S POST-PETITION CASH AND ARE NOT TERMINATED BY SECTION 552 OF THE BANKRUPTCY CODE.

Cash collateral is defined by 11 U.S.C. §363(a). Any income or cash from property subject to a security interest as provided in 11 U.S.C. §552(b) falls within that definition. *Virginia Beach Federal Savings & Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir. 1990). The Bankruptcy Court is directed both by the specific terms of §552 and applicable authorities to an examination of non-bankruptcy state law in determining the extent to which a pre-petition security interest attaches to post-petition property. *Buttner v. United States*, 440 U.S. 48, 54-57,

4

99 S.Ct. 914, 917-19, 59 L.Ed.2d 136 (1979) and *Virginia Beach Federal Savings & Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir. 1990).

The test to determine the extent of a security interest under 11 U.S.C. §552(b) requires that (a) there must be a pre-petition security agreement, (b) the security agreement by its terms must extend to the Debtor's pre-petition property and to proceeds, product, offspring, revenues, profits, etc., of such property, and (c) applicable non-bankruptcy law (state law) must permit the security agreement to extend to such after-acquired property. *Smith v. Dairymen, Inc.*, 790 F.2d 1107 (4th Cir. 1986). The Security Documents meet each such requirement.

A.    There Exist Pre-Petition Security Agreements Under Which the First Mortgage Noteholders are Beneficiaries.

Debtor concedes the existence of security agreements covering pre-petition property under which the First Mortgage Noteholders are beneficiaries and attaches them as Exhibits D, E, F and G to its Motion. While these are not all of the security agreements between the parties, they are sufficient for purposes of this Motion. The fact that there are multiple documents constituting the security interest instead of a single document makes no difference. *Federal Deposit Insurance Corporation v. Coones*, 954 F.2d 596, 600 (10th Cir. 1992).

B.    The Security Documents by Their Terms Extend to the Debtor's Pre-Petition Property and to Proceeds, Product, Offspring or Profits of Such Property.

The Deed of Trust (Exhibit F to the Motion) provides for the attachment of the security interest not only to the real estate and fixtures, but *inter alia*, to:

> 1.1    Grant of Deed of Trust. Trustor does here irrevocably grant, assign, bargain, convey, transfer, warrant, and set over unto the trustee, IN TRUST, WITH POWER OF SALE, under and subject to the terms and conditions hereof, for the benefit and security of the Beneficiary and for the ratable benefit and security of all the Holders, all of Trustor's right, title and interest in and to all of the following property, to the extent assignable under applicable law, whether now owned or hereafter acquired (collectively, the "Trust Property"):

5

. . .

(e)     any and all contract rights of whatever nature, whenever acquired, relating to the Trust Property described in this Section 1.1 including without limitation . . . contracts for goods or services and <u>management contracts</u> (emphasis supplied). . . .

. . .

(j)     any and all income, rents, receipts, security or similar deposits, revenues, issues, royalties, profits, earnings, products and proceeds from any and all of the Land or any buildings or other the Improvements, now owned or hereafter acquired (collectively, the "<u>Rents, Issues and Profits</u>") . . .

. . .

(m)     any and all monies in the possession of Beneficiary of any Holder . . .

. . .

(s)     any and all goods, inventory, equipment, building and other materials, supplies, and other tangible personal property of every nature now owned or hereafter acquired by Trustor and used or intended for use in the construction, development, or operation of the Land or any the Improvements (including without limitation all opened and unopened food and liquor supplies);

. . .

(u)     any and all franchise, operating and <u>management agreements</u>, liquor and gaming licenses (in each case, to the full extent legally assignable), restaurant, occupancy, hotel, motel and other licenses, permits and authorizations relating to the operation of the Improvements; (emphasis supplied)

(v)     any and all deposit accounts or other bank or similar accounts of Trustor (together with all amounts in any such accounts), monies, accounts, accounts receivable, contract rights and general intangible (whether now owned or existing or hereafter created or acquired, and including proceeds thereof) relating in any way to, or arising in any manner from, Trustor's ownership, use, operation, leasing, or sale of all or any part of the property, rights

6

Doc# 1712152\2

and interests described in this Section 1.1 (including without limitation all monies, rents, receipts, proceeds and compensation of every kind whatsoever received by or on behalf of Trustor and produced from . . . (iv) all food and beverage sales, (v) garage and parking rentals, . . . (viii) income from vending machines and newsstands, (ix) recreational fees, . . . and (xi) entertainment revenues;

. . .

     (aa)   any and all monies and other property, real or personal, which may from time to time be subjected to the lien hereof by Trustor or by anyone on its behalf or with its consent or which may come into the possession or be subject to the control of Beneficiary pursuant to this Deed of Trust or any Collateral Document, including without limitation any protective advances under this Deed of Trust;

. . .

     (cc)   any and all after-acquired property in the same categories as any of the foregoing clauses of this Section 1.1, . . .

     (dd)   to the extent not otherwise included in the foregoing, any and all proceeds and products of any and all of the foregoing and, to the extent permitted by applicable law, proceeds of any and all Gaming and Liquor Licenses even if such Gaming and Liquor Licenses are not subject to the liens granted hereunder and all collateral security and guarantees given by any person with respect to any of the foregoing, and in any event including without limitation any and all . . . (iii) products of the Trust Property, (iv) other amounts from time to time paid or payable under or in connection with any of the Trust Property . . .

The Security Agreement (Exhibit E to the Motion) contains similar provisions. It grants a security interest in property of the Debtor, including all of Debtor's right, title and interest "whether now or hereafter existing" in and to:

     (iv)   all Contract Rights;

7

(v)     all Deposit Accounts (including, without limitation, the
Hyatt Gaming Accounts and each Assignee Deposit
Account);
. . .

(vii)   all General Intangibles . . .

(viii)  all Goods (including, without limitation, all its Equipment,
Fixtures and Inventory), and together with all accessions,
additions, attachments, improvements, substitutions and
replacements thereto and therefor;

. . . and all proceeds, products, offspring, rents, issues, profits and
returns of and from any of the foregoing . . .

Accordingly, there is simply no doubt that the security interests held for the benefit of the

First Mortgage Noteholders extend to proceeds, product, offspring, profits, etc. of such property

as required by 11 U.S.C. §552(b).

C.      Colorado Law Permits the Language Utilized in the Security Agreements to
Extend to the Debtor's Post-Petition Cash.

There are several provisions of the Security Documents that pertain to this issue and

provide for this extension. It is sufficient for the First Mortgage Noteholders to prevail on but a

single one of these. Conversely, the Debtor must avoid the extension of the security agreement

in each instance in order to take the post-petition cash free and clear of the security interest.

1.      All of the Debtor's Cash is Subject to the Security Agreement Since it is
All Proceeds of a Pre-Petition Contract Right.

All of the Debtor's cash proposed for corporate expenditures comes from or is generated

by its casino and affiliated operations. Debtor concedes in Exhibit A that the casino is managed

by and under the exclusive control of Hyatt Gaming pursuant to a Management Agreement. A

copy of that Management Agreement is attached as Exhibit 1 and incorporated by this reference.

It provides at page 26, Section 4.3, for Remittances to Owner as follows:

8

> Contemporaneously with furnishing the monthly statement for
> each calendar month pursuant to Section 7.4 hereof, Hyatt Gaming
> shall remit to Owner out of the Operating Accounts an amount (the
> "Owner's Remittance Amount") by which the total funds then in
> the Operating Accounts exceed the amount then reasonably
> required to be maintained in the Operating Accounts (after
> withdrawal of the Annual Management Fee and after fulfilling the
> provisions of the supplemental payment as required in Section 4.4
> hereof) in order to carry on the operation of the Casino pursuant to
> the First Class Casino Standard and so that Hyatt Gaming may
> perform its obligations hereunder. Each remittance shall be paid to
> Owner at Owner's address then in effect hereunder for receipt of
> notices hereunder by Owner, or at such other place as Owner may,
> from time to time, designate in a notice to Hyatt Gaming.

Debtor concedes at footnote 6 of its Motion that post-petition collections on pre-petition contract rights are subject to a secured creditor's interest and survive the effects of 11 U.S.C. §552(a).[3] Debtor states numerous times in its Motion that it intends to reject the Management Agreement, but has yet to initiate such action. The Debtor has not filed any motion and this Court has not granted any authority for the rejection of the Management Contract. Until then, all Debtor's cash is subject to the security interests which benefit the First Mortgage Noteholders.

### 2.   The Language Employed in the Security Agreements is Sufficient Under Colorado Law to Reach the Debtor's Post-Petition Cash.

In making its argument that 11 U.S.C. §552(a) extinguishes the security interests of the First Mortgage Noteholders in the post-petition cash, Debtor cites only four Colorado bankruptcy cases. Two of those deal with the law of other states. *In re Investment Hotel Properties, Ltd.*, 109 B.R. 990 (Bankr.D.Colo. 1990) deals exclusively with Missouri law. *In re GGVXX, Ltd.*, 130 B.R. 322 (Bankr.D.Colo. 1991) addresses Arizona law. All four of the Colorado bankruptcy

---

[3] The concession mirrors existing law. *United Virginia Bank v. Slab Fork Coal Company*, 784 F.2d 1188 (4th Cir. 1986). Indeed the Debtor cites *In re HRC Joint Venture*, 175 B.R. 948 (Bankr.S.D.Ohio. 1994) which involved a Hyatt management contract similar to this case. The court disallowed post-petition coverage because the creditor did not take a security interest in the contract but only the right to remittances. Here, however, the security clearly covers "management contracts and "contract rights". Plainly the post-petition payments under the contract are collateral of the First Mortgage Noteholders.

9

Doc# 1712152\2

decisions are pre-1992. This is crucial because in 1992 the Colorado Court of Appeals set out Colorado law for the first time on this issue – and came down on the secured creditor's side, specifically rejecting the reasoning employed in the Debtor's cited cases. *Great West Life Assurance Company v. Raintree Inn*, 837 P.2d 267 (Colo.App. 1992).[4] In that case, the Colorado Court of Appeals analyzed a deed of trust as follows:

> Defendants' principal contention on appeal is that revenues from hotel operations are in the nature of personal property and, therefore, cannot be secured through an assignment of "rents, issues and profits" incident to the creation of an interest in realty under a deed of trust. We hold, under the particular documents here, that the revenue from the hotel lodgings, bar and restaurant facilities, and vending machines, regardless of their specific character, fall within the class of security established by the assignment and the deed of trust.

837 P.2d at 270.

The Court further stated:

> Application of these principles here supports a construction of an assignment of rents which identifies revenues from operation of a business on the premises with rents, issues, and profits of the real property so long as unambiguous language of the governing instrument subjects the assignor's business to the debt.

837 P.2d at 270.

The Court addressed the competing line of authority arising primarily out of bankruptcy courts, with citations to three different Colorado bankruptcy court decisions including the *In re Investment Hotel Properties* case cited by the Debtor. It rejected that reasoning, finding instead that a Colorado deed of trust could and did extend to revenues and profits from a business located on the property. The Court stated:

> A similar result commands itself with respect to income of the restaurant and bar facilities and vending machines. Although such

---

[4] Shepardizing *Investment Hotel* would have led to *Great West* since *Investment* is cited therein. Curiously, the Debtor does not bring this controlling Colorado authority to the Court's attention nor does it distinguish or deal with the case in any manner whatsoever.

10

income was derived from customers who paid primarily for goods and services, rather than from lodgers who paid for use and occupation of space, we believe that the words in the deed of trust "rents, issues and profits, *income* and *revenues*" (emphasis supplied in original) must be taken to encompass all income or revenues from the various business activities conducted on the premises. In our view, that is what was bargained for by the original parties to the deed of trust.

837 P.2d at 271.

Comparing the language employed by the parties in *Great West Life Assurance Company* with the language cited in the instant deed of trust reveals, if anything, that the agreement of the parties in this case – to encumber revenues from the Management Contracts, operations, use or occupancy of any part of the premises – was even greater and more extensive than the encumbrance in *Great West Life Assurance Company.* Under this analysis, the realty covered by the deed of trust is the encumbered pre-petition property; cash generated by Debtor's business, whether pre-petition or post-petition, amounts to the rents, issues and profits from the operation of that business on the encumbered premises which the Colorado Court of Appeals held is covered by the underlying deed of trust. Consequently, whatever the law in other states and whatever the law in this bankruptcy district prior to 1992, it is clear that today the law in Colorado subjects the Debtor's cash in this case, whether pre-petition or post-petition, to the deed of trust which benefits the First Mortgage Noteholders.[5]

### 3.   The Debtor's Cash is the Product or Proceed of the First Mortgage Noteholders' Pre-Petition Security.

11 U.S.C. §552(b) protects the products and proceeds of collateral held in a pre-petition security interest. Debtor argues only that its post-petition revenues are "accounts" without any other analysis. But the First Mortgage Noteholders' security interests extend to the gaming devices (those devices are excluded only if Colorado law prohibits the taking of a security

---

[5] Because Colorado considers these revenues to be an interest in realty, the Debtor's cases and discussion characterizing the interests as personalty or accounts are interesting but irrelevant.

11

interest, which it does not; Debtor has neither cited any law nor made any contention that
Colorado law prohibits the attachment of the security interest). The vast majority of the Debtor's
cash comes from the gaming devices, whether in the form of slot machines or black jack tables
and cards. Debtor's cash is the product, proceed or profit of these devices. Put simply, the
Debtor is not entering into any brand new gambling contracts with each gambler in a vacuum.
Indeed, without the existence of the slot machines and the black jack tables, the Debtor would be
unable to perform any contract. The cash enjoyed as a result of the use of these devices is a
product, proceed or profit of them. This situation is best analogized, in western tradition, to milk
from a cow. *Smith v. Dairymen, Inc.*, 790 F.2d 1107 (4th Cir. 1986) and *In re Wiegmann*, 95
B.R. 90 (Bkrtcy.S.D.Ill. 1989).

The debtors in those cases maintained that the post-petition milk and its cash proceeds
were entirely post-petition property. Those courts rejected that argument, which is accepted
elsewhere only via a tortured and unduly unduly narrow definition of product.

Clearly, the cow is fed post-petition hay, milked by post-petition labor and its milk sold
post-petition. Nonetheless, the milk could not exist without the pre-petition collateral, i.e., the
cow. The same is true in this case. Debtor may argue that the post-petition gambler comes in
with his post-petition money that he feeds into the slot machine like hay into a cow and that that
money is harvested by post-petition labor cleaning out the slot machine as a cow is milked.[6] But
as with a cow, that product would not exist without the pre-petition collateral, i.e., the gaming
devices. 11 U.S.C. §552(b) preserves that security interest and refuses to give the Debtor a free
ride or, as in the milk cases, free milk, or as in this case, a free bet.

D.  All of the Debtor's Cash is Cash Collateral and in the Absence of Compliance
    with 11 U.S.C. §363(c) May Only be Used in the Preservation of the Secured
    Creditor's Interest in the Property.

Debtor may only use cash collateral upon the consent of the secured party or an order of
the Court. 11 U.S.C. §363(c)(2). As stated previously, the First Mortgage Noteholders consent

---

[6] Colorado law defines "proceeds" to include whatever is collected on or distributed on account of collateral. 1973
C.R.S. 4-9-102(64)(B).

12

only to the use of the operating monies by Hyatt Gaming in the actual operation of the casino. They do not consent to the line item called Corporate Costs on the Consolidated Operating Budget as explained on the Projected Owner Operating Costs on Exhibit A. The Debtor represents that it should be allowed to use cash for its budgeted items because the expenditures "represent the normal operating and management costs for the casino and are consistent with the type of expenses approved by the Court in *In re Morning Star Ranch Resorts*, 64 B.R. 818 (Bkrtcy.D.Colo. 1986)" Of course, saying so doesn't make it so. The First Mortgage Noteholders request an evidentiary hearing to examine these items. The Exhibits submitted with the Motion appear to the contrary as note 1 to the Operating Budget states that Hyatt Gaming has complete control of the operations under the terms of the Management Contract in place at this time. Therefore one would expect that only the monies expended by Hyatt Gaming are necessary for the preservation of the secured parties' interest in the collateral and the balance of the expenditures go to the Debtor's ordinary corporate expenses or to restructuring. Indeed, the types of expenses whose use should be allowed without the posting of adequate protection would seem to be those limited to the types of expense recoverable by the estate under 11 U.S.C. §506(c). Almost by definition, if the expenditure is not one that can be charged under §506(c), it is not one which benefits the secured party's collateral and therefore is not necessary for the preservation of that collateral. Most of the expenses recited by the Debtor in its Motion are simply general corporate expenditures. The Motion indicates that the Debtor's employees prepare all SEC filings, all IRS filings, all financial reports and presumably will prepare all United States Trustee filings and other such matters. None of these are for the preservation of the collateral and all are general corporate expenses. None are authorized by *Morning* Star, 64 B.R. at 822. The Debtor ought not to be authorized to expend any cash collateral without providing full and complete adequate protection.

The Motion recites that the Debtor's personnel oversee and its professionals conduct construction litigation. Those issues are not relevant to the preservation of the secured collateral, at least not for the benefit of the secured parties. The secured parties are themselves parties to that mechanic's lien litigation and are required to represent their own position with respect to

13

validity and priority of their liens relative to the mechanic's liens. Debtor is, of course, interested in the outcome of that litigation but it is interested in protecting its ownership position, not in preserving the secured parties' position. The Debtor ought not to be allowed to use any cash collateral for such efforts in the absence of providing complete and full adequate protection. Debtor's budgets show an office in Dallas, an apartment in Evergreen, travel expenses and board of director meeting expenses as well as extensive employee benefits, retention bonuses, and director and officers insurance. None of these are necessary for the preservation of the collateral. All are ordinary corporate expenses and the Debtor ought not to be allowed to utilize cash collateral in the absence of providing complete and full adequate protection.

Finally, if the post-petition cash is free of any claim by the First Mortgage Noteholders, the pre-petition cash is clearly subject to the lien. The Debtor should be required to use only post-petition cash. Allowing the use of pre-petition cash without adequate protection (and none is proposed) only allows a destruction of the security interest over time by using the collateral to operate and then collecting the revenues free of the lien. Neither §363(c) nor *Morning Star Ranch* contemplate nor allow such a result.

## SUMMARY

In conclusion, the First Mortgage Noteholders request that the Court deal with the Debtor's Motion by the entry of an order containing the following:

1.     A finding that all of the Debtor's cash is subject to the security interest benefiting the First Mortgage Noteholders and constitutes cash collateral; and

2.     An order limiting the Debtor's use of the cash collateral to the amounts required by Hyatt to operate the casino as contained in the Consolidated Operating Budget exclusive of Corporate Costs (the Projected Owner Operating Costs); and

3.     That the Court order the Debtor to segregate and account for all cash exclusive of that cash expended pursuant to paragraph 2, above; and

14

Doc# 1712152\2

4.     That the Court grant such other and further relief as may be appropriate.

Dated this __19__ day of December, 2002.

LINDQUIST & VENNUM P.L.L.P.

By_____
        Craig A. Christensen, #4490
600 Seventeenth Street
Suite 1800 South
Denver, Colorado 80202-5441
Telephone: (303) 573-5900
Facsimile: (303) 573-1956
cchristensen@lindquist.com

Michael Cook
Janet Beck
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Telephone: 212.756.2000
Facsimile: 212.593.5955
E-mail: michael.cook@srz.com
E-mail: janet.beck@srz.com

Attorneys for the Noteholders

15



## CERTIFICATE OF SERVICE

I hereby certify that on this ____ of December, 2002, a true and accurate copy of the foregoing **OBJECTION TO DEBTOR'S MOTION FOR USE OF CASH IN ORDINARY COURSE OF BUSINESS AND FOR AUTHORITY TO USE CASH COLLATERAL** was deposited in the U.S. Mail, first class postage prepaid, addressed to the names on the attached list.

16

Colorado Department of Revenue
1375 Sherman Street
Denver, CO 80261-0012

Paul, Hastings, Janofsky & Walker LLP
555 South Flower Street, 23rd Flr
Los Angeles, CA 90071

International Game Technology
301 Commercial Road
Golden, CO 80401

WMS Gaming
800 S. Northpoint Blvd.
Waukegan, IL 60085

Anchor Games
Department 7866
Los Angeles, CA 90088-7866

MetroNorth Newspapers
P.O. Box 350070
Westminster, CO 80035

Clear Channel Colorado (KOA Radio)
3936 Collections Center Drive
Chicago, IL 60693

Jeffrey M. Reisner, Esq.
Irell & Manella LLP
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660

U.S. Trustee
999 18th Street, Suite 1551
Denver, CO 80202

Lisa K. Mayers, Esq.
Grimshaw & Harring, P.C.
1700 Lincoln Street, Suite 3800
Denver, CO 80203

Sullivan & Associates
32 Quail Run Road
Henderson, NV 89014

US Foods
Dept. 597
Denver, CO 80271

Paul Steelman Interiors, Inc.
3330 West Desert Inn Road
Las Vegas, NV 89102

Nobel/Sysco Food Services Co.
1101 W. 48th Avenue
P.O. Box 5566
Denver, CO 80217

American Express
Suite 1001
Chicago, IL 60677-001

TYCO/Fire &
Security/SimplexGrinnell
Dept CH 10320
Palatine, IL 60055-0320

Good Signs
Attention: Mitzi D. Wineland
14985 W. 62nd Ave.
Golden, CO 80403

Mark Fulford, Esq.
Sherman & Howard LLC
633 17th Street, Suite 3000
Denver, CO 80202

John B. Wasserman, Esq.
Harvey Sender, Esq.
Bonnie Bell Bond, Esq.
Sender & Wasserman, P.C.
1999 Broadway, Suite 2305
Denver, CO 80202

Michael L. Cook, Esq.
Janet Beck, Esq.
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022

Premium Financing Specialists
P.O. Box 90819
Austin, TX 78709-0819

Denver Newspaper Agency
Dept. 485
Denver, CO 80281-0485

Parker Blake, Inc.
7012 South Revere Parkway
Suite 120
Englewood, CO 80112

Global Payments
P.O. Box 66700
Chicago, IL 60666-0700

KXKL-FM (KOOL 105) Radio
1560 Broadway, Suite 1100
Denver, CO 80202-5144

Jefferson-Pilot (KYGO-FM Radio)
1095 S. Monaco Parkway
Denver, CO 80224

Paul Rubner, Esq.
Rubner Padjen and Laufer LLC
1600 Broadway, Suite 2800
Denver, CO 80202

Ceri Williams
Assistant Attorney General
Business and Licensing Section
1525 Sherman Street, 5th Floor
Denver, CO 80203-1760

Warren S. Bloom, Esq.
Nabors, Gibline & Nickerson, P.A.
CNL Center, Suite 510
480 South Orange Avenue
Orlando, FL 32801

Steven W. Kelly, Esq.
Silver & DeBoskey
1801 York Street
Denver, CO 80206

Daniel A. Hepner, Esq.
Lirtzman Nehls & Hepner, P.C.
190 Arapahoe Avenue
Boulder, CO 80302

Steven E. Abelman, Esq.
Cage Williams Abelman & Layden, P.C.
1433 Seventeenth Street
Denver, CO 80202

Compton Dancer Consulting, Inc.
3690 S. Eastern Avenue, Suite 213
Las Vegas, NV 89109-3377

Wells Fargo Bank N.A.
Attn: Rochanne Hackett
5340 Kietzke Lane
Reno, NV 89511

Hubert A. Farbes/ Michael J. Pankow
Daniel J. Garfield
Brownstein, Hyatt & Farber, P.C.
410 17th Street, Suite 2200
Denver, CO 80202-4004

Daniel A. Sweetser, Esq.
Daniel J. Block, Esq.
Robinson Waters & O'Dorisio, P.C.
1099 18th Street, Suite 2600
Denver, CO 80202

James T. Markus, Esq.
1700 Lincoln Street
Suite 3550
Denver, CO 80203

Black Haw B.I.D.
C/o Paul Goedecke
950 Wadsworth Blvd., #204
Lakewood, CO 80215

Stephen R. Harris, Esq.
Belding, Harris & Petroni, Ltd.
417 West Plumb Lane
Reno, NV 89509

Michael Armstrong
Windsor Woodmont Black Hawk R
111 Richaman Street
Black Hawk, CO 80422

D. Heller/P. Knight
Latham & Watkins
233 S. Wacker Drive
Sears Tower #5800
Chicago, IL 60606

Premium Financing Specialists
P.O. Box 90819
Austin, TX 78709-0819

UNITED STATES BANKRUPTCY COURT

DISTRICT OF COLORADO

# Notice of End of Electronic Document

NOTICE IS HEREBY GIVEN that the preceding exhibit, attachment, or supporting document contains additional pages that have not been scanned or otherwise converted to an electronic format. These additional pages do not appear as a continuation of this document. Pursuant to the Administrative Procedures for Electronic Case Files promulgated by the Court in General Procedure Order 2001-8, these additional pages may not be retained in the electronic case records.

To view the additional pages in this document, please see the paper case file record.

FOR THE COURT

Bradford L. Bolton, Clerk