FILED
BRADFORD L. BOLTON
CLERK

2003 JAN -9 PM 3: 58

U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE: ) | |
| ) | |
| WINDSOR WOODMONT BLACK ) | Case No. 02-28089-ABC |
| HAWK RESORT CORPORATION, ) | |
| a/k/a the Black Hawk Casino by Hyatt, ) | |
| a Colorado corporation, ) | |
| ) | |
| EIN 75-2720870, ) | |
| ) | Chapter 11 |
| Debtor. ) | |

### REPLY TO FIRST MORTGAGE NOTEHOLDERS' OBJECTION TO THE DEBTOR'S MOTION FOR USE OF CASH IN ORDINARY COURSE OF BUSINESS AND FOR AUTHORITY TO USE CASH COLLATERAL

Windsor Woodmont Black Hawk Resort Corporation, a Colorado corporation, debtor and debtor-in-possession in the above-captioned case (the "Debtor"), hereby replies to the First Mortgage Noteholders' (the "Noteholders") Objection (the "Objection") to the Debtor's Motion for Use of Cash in the Ordinary Course of Business and for Authority to Use Cash Collateral (the "Motion") and respectfully states as follows.[1]

### INTRODUCTION

Distilled to its essence, the Debtor's position is that the Motion should be granted because:

(1) assuming, <u>arguendo</u>, that the Noteholders have a pre-petition security interest on all of the Debtor's assets, upon the filing of the chapter 11 petition that security interest was cut off as to assets of the Debtor which come into existence post petition,

(2) the Noteholders' pre-petition lien will extend to assets which come into existence post petition only to the extent that those assets are the proceeds of assets in which the Noteholders had a pre-petition security interest, (in this case, the Noteholders allege they have a pre-petition security interest in the Debtor's gaming devices)

(3) the term "proceeds", as it is used in Section 552(b) means cash created by a liquidation or other <u>disposition</u> of the asset in which the Noteholders had a pre-petition security interest,

---

[1] Capitalized terms not defined herein shall have the same meaning provided for in the Motion.

624083.02 03

(4) cash generated by the Debtor based upon the post petition operation of the Debtor's business is not a proceed of the gaming devices even if those gaming devices are used as a part of the generation of the post petition cash,

(5) the relevant test is whether the post petition cash is generated as a result of the Debtor's post petition services and operations, and that test is satisfied by the Debtor in this case, and

(6) in this case the Noteholders do not even have a present security interest in the gaming devices, so even if the test in (5) alone were not satisfied, the Noteholders would not have a post petition security interest in the post petition cash.

## I. THE POST PETITION CASH IS NOT CASH COLLATERAL

The Noteholders objected to the Debtor's use of the cash generated post petition from the operating of the Debtor's casino ("Post Petition Cash") arguing that they have a security interest in such funds under Colorado law that survived the effect of Section 552(a) of the Bankruptcy Code[2], which invalidates liens on property acquired by a debtor post-petition. However, in making this argument, the Noteholders misstated the applicable test for the preservation of liens on after acquired property and failed to satisfy their burden of establishing that their pre-petition lien extends to the Post-Petition Cash.

As demonstrated in the Motion and in this Reply, the Post Petition Cash is not subject to any security interest in favor of the Noteholders because (1) it is property acquired post-petition that is not subject to the narrow exceptions to Section 552(a) contained in Section 552(b), and (2) even if it were subject to the narrow exceptions to Section 552(a), the Noteholders do not have a present security interest in the Debtor's gaming devices and thus can under no circumstances have a security interest in the proceeds of the operation of those gaming devices. Further, the Post Petition Cash is not proceeds of the Management Agreement with Hyatt Gaming.

Thus, the Noteholders do not have a security interest in the Post Petition Cash, and, as to them, the Post Petition Cash is not cash collateral.

### A. The Post Petition Cash Does Not Fall Within The Narrow Exceptions To The Bankruptcy Rule Invalidating Liens On After-Acquired Property

Section 552(a) provides that:

> (a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

Subsection (b) provides very limited exceptions to the effect of subsection (a). The Noteholders erroneously argue that under Section 552(b), the test to determine the extent of

---

[2] All references to Sections are references to the Bankruptcy Code.

a secured creditor's security interest in after-acquired property of a debtor is satisfied if (1) the security agreement by its terms extends to a debtor's pre-petition property and to the "proceeds, product, offspring, revenues, profits, etc." of such property, and (2) applicable state law permits the security agreement to extend to such after acquired property. The Noteholders' focus on state law and the language of the security agreement in interpreting Section 552(b) ignores the impact of Section 552(a) which was drafted to "facilitate a debtor's fresh start" and to allow a debtor to gather into the estate as much money as possible to satisfy the claims of all creditors by invalidating the liens of secured creditors on property acquired by a debtor post-petition In re Investment Hotel Properties, Ltd., 109 B.R. 990, 995 (Bankr. D. Colo. 1990); In re Bering Trader, Inc., 944 F.2d 500, 502 (9th Cir. 1991). If the extent of a secured creditor's interest in after-acquired property depended solely on the language of the security agreement and state law, Section 552(a) would be meaningless as all secured creditors would retain post petition whatever pre-petition rights to after-acquired property they had under state law.

Section 552(b) was only intended to provide a "narrow exception" to the general rule of Section 552(a) for certain specified types of after-acquired property. Bering Trader, 944 F.2d at 502. In order to save a claimed security interest from the invalidating provisions of Section 552(a), it is the secured creditor's burden to establish that (1) it has a valid security interest in pre-petition property of the debtor, (2) the security agreement by its terms extends to the after-acquired property specified in Section 552(b), namely, the proceeds, product, offspring, profits, or rents of such property, and (3) the "after-acquired property itself must fit within one of the categories [of after acquired property] enumerated in Section 552(b)." In re Lykes Bros. Steamship Co., Inc., 216 B.R. 856, 863-864 (Bankr. M.D. Fla. 1996). (emphasis added) The Noteholders argument ignores the third element of the test.

The Post Petition Cash is not subject to any security interest because it does not fit within one of the types of after-acquired property enumerated in Section 552(b)(1) or (2). The Noteholders' arguments that the Post Petition Cash is subject to their security interest as either (1) rents, issues or profits from the real property under Colorado law, (2) proceeds of the Debtor's Management Agreement with Hyatt, or (3) proceeds of the gaming equipment, seriously mischaracterize the relevant facts and law and are without merit.

### 1. The Post Petition Cash Is Not The Rents, Issues Or Profits Of Real Property

The Noteholders' argument that the Post Petition Cash is the rents, issues or profits of their security interest in the real property completely misstates the holding of the only case they cite as being controlling authority for this argument; namely Great West Life Assurance Company v. Raintree Inn, 837 P.2d 267 (Colo. App. 1992).

Contrary to the Noteholders' assertion, the court in Great West did not hold that cash generated in a debtor's business is "an interest in realty" as the "rents, issues and profits from the operation of that business on the encumbered premises." Rather, the Great West court only held that, as a matter of contract interpretation, the language of the assignment contained in the deed of trust was broad enough to cover all income and revenue streams from the Debtor's business, regardless of whether the revenue was characterized as an

interest in real property or an interest in personal property.³ The Great West court stated its holding as follows:

> We hold, <u>under the particular documents here</u>, that the revenue from hotel lodgings, bar and restaurant facilities, and vending machines, <u>regardless of their specific character</u>, fall within the class of security established by the assignment and deed of trust. <u>Id.</u>, 837 P.2d at 270 (emphasis added).

Indeed, the Great West court's opinion is replete with language demonstrating that the court did not determine that a debtor's business revenue is the rents, issues or profits of the debtor's real property. For example, in distinguishing other authority, the Great West court declared that:

> In some instances, state statutes exist (not here present) which limit the scope of assignments <u>to interests in real property</u>. [citations omitted]. Here, the language of the assignment clearly gave plaintiff a right to virtually all of the income streams flowing from use of the defendant's property, not just <u>income attributable to an interest in the real estate itself</u>. <u>Id.</u>, 837 P.2d at 271 (emphasis added).

The court thus indicated that its holding was dependent on its interpretation that the language of the assignments specifying a lien on "income and revenue" was broad enough to cover income from personal property and not just income attributable to the real property. In addition, the Great West court emphasized that the deed of trust included an assignment of "rents, issues, and profits, <u>income and revenues</u>" in holding that the language of the deed of trust was broad enough to encompass all of the debtor's business income. <u>Id.</u>, 837 P.2d at 271 (emphasis in original). By emphasizing that the debtor's business revenues were covered as "income and revenues," as opposed to "rents, issues and profits," the Great West court was clearly not holding that the business revenues were rents, issues and profits of the real property.

The fact that a deed of trust may be broad enough on a pre-petition basis to cover personal property interests in accounts and income as well as real property interests is irrelevant to a determination of whether a claimed security interest is saved from the invalidating provisions of Section 552(a) pursuant to Section 552(b), because the relevant test under Section 552(b) is whether the business revenue fits within one of the categories of after acquired property specified in Section 552(b): namely whether the revenue is the proceeds, product, offspring, profits, or rents of pre-petition property of the debtor, as that test is applied in a bankruptcy context. See, In re Lykes Bros. Steamship Co., Inc., 216 B.R. 856, 863-864 (Bankr. M.D. Fla. 1996); see Bering, 944 F.2d at 502 (holding that omission of term "accounts" from Section 552(b) exception was because accounts could include a right to payment for services rendered and inclusion of such a broad term in Section 552(b) would result in the exception swallowing the rule). Since the Great West court did not hold that a debtor's business revenue is the rents, issues or profits of real property under Colorado law, and did not even involve a debtor in bankruptcy or an analysis of the effect of Section

---

³ The Great West court stated that the question presented in that case was "a determination of the scope of the specific language contained in the documents here." Great West, 837 P.2d at 270.

552, the opinion is irrelevant to a determination of whether the Noteholders' lien extends to after acquired property acquired post petition under Section 552(b).[4]

Significantly, while the Noteholders stated that the Debtor's cases and discussion characterizing the Post Petition Cash as accounts or personally were interesting, they failed to dispute or otherwise respond to this authority. This failure is fatal to the Noteholders' argument because the cases cited by the Debtor in the Motion are all on point and hold that revenues from a debtor's business are not the rents, issues or profits of real property. See, e.g., In re Corner Pockets of the Southwest, Inc., 85 B.R. 559, 563 (Bankr. D. Mont. 1988) (holding that restaurant and entertainment revenue was not cash collateral because it was the product of debtor's services, not real property); In re Countryside Bowling Center, Inc., 203 B.R. 765, 766 (Bankr. M.D. Fla. 1996) (holding that post-petition revenues of bowling alley were not cash collateral); In re GGVXX, Ltd., 130 B.R. 322, 326 (Bankr. D. Colo. 1991) (holding that post-petition golf course revenue was not cash collateral because it was "best and most accurately characterized as business receipts or personal property and not rental payments which are directly tied to and wholly dependent upon the use of the real property upon which the business is conducted").

### 2. The Post Petition Cash Is Not The Proceeds Of The Management Agreement

The Noteholders' argument that the Post Petition Cash is not the Debtor's revenue from the operation of the Casino, but is instead the Debtor's post-petition collection on and proceeds of the Management Agreement, ignores the fact that the terms of the Management Agreement expressly provide that all of the Cash generated by the operation of the Casino is property of the Debtor and that Hyatt is the agent of the Debtor with respect to the management and operation of the Casino.[5] It is, however, an acknowledgment that in order for the Bondholders to prevail, they must establish that the post petition revenue is the proceeds of a pre-petition asset. If the management agreement were sold to a third party, the Noteholders' security interest would extend to the proceeds of that sale, but that is not the case here.

---

[4] In the Objection, the Noteholders, at footnote 4 on page 10, comment on the fact that the Debtor did not bring the Great West decision to the Court's attention in the Motion. Debtor did not do so because, in spite of the Noteholders misguided reliance on Great West in their objection, the case is not relevant to the issues raised by the Motion.

[5] The First Mortgage Noteholders erroneously state that the Debtor conceded that post-petition collections on pre-petition contract rights survive the effects of Section 552(a). The Debtor did not make such a concession. In footnote 6 of the Motion, the Debtor discussed the status of accounts receivable and stated that "[a]rguably, a secured creditor with a lien on contract proceeds would be entitled to proceeds from the post-petition liquidation of a pre-petition contract." (emphasis added). This statement is consistent with the authority cited in the Motion which held that a secured creditor's lien on accounts receivable only extends to the proceeds from the liquidation of accounts receivable in existence pre-petition. Investment Hotel Properties, 109 B.R. at 995-997. Since the Post Petition Cash is not a proceed derived from a liquidation of the Management Agreement, the issue is not relevant to the instant matter.

The situation is analogous to a company that is in the business of providing security for homeowners and has contracts with each homeowner to provide that security. If the company were to file a chapter 11, a lender having a pre-petition security interest in those contracts would have a post petition lien on the proceeds of the sale of those contracts to a third party, but would not have a lien on the post petition revenue collected by the company in return for its continuing to supply security services post petition to its homeowner customers.

Section 3.3 of the Management Agreement, attached as Exhibit 1 to the Objection, outlines the Debtor's and Hyatt's respective interest in the funds generated by the operation of the Casino as follows:

> All monies received by [Hyatt] in the operation of the Casino, including funds in the Operating Account, shall be deemed to be property of [the Debtor], and shall be received by [Hyatt] as agent for, and for the benefit of, [the Debtor], other than those amounts owing to [Hyatt] hereunder.

Section 3.3 of the Management Agreement thus identifies all revenue from the operation of the Casino as the Debtor's property, not just the amounts separately remitted to the Debtor pursuant to section 4.3 of the Management Agreement.

Furthermore, section 3.4 of the Management Agreement unequivocally defines Hyatt's role as the Debtor's agent under the Management Agreement by providing that "[t]he relationship between the parties hereto shall be that of principal, in the case of [the Debtor], and agent, in the case of [Hyatt]" and that "[nothing contained herein shall be deemed or construed to render the parties hereto partners, joint venturers, landlord/ tenant, or any relationship other than principal and agent." (emphasis added).

The fact that the Management Agreement allows Hyatt to first pay the casino's operating expenses (including its own management fee) and then pay the remainder to the Debtor is irrelevant because this device cannot change the character of the funds which are paid to the Debtor. The Management Agreement clearly provides that all of these funds (i.e. the revenue from the operation of the Casino) are the property of the Debtor, whether they are remitted to the Debtor or not. Moreover, the Management Agreement provides that all funds received by Hyatt from the operation of the Casino are expressly received as the agent for the Debtor and for the express benefit of the Debtor.

The character of the Post Petition Cash as property of the Debtor derived from the operation of the Casino cannot be changed to proceeds derived from collections on the Management Agreement simply because the Debtor's agent manages the Debtor's business.[6]

---

[6] The cases cited by the Noteholders regarding the status of contract proceeds are inapplicable because they do not deal with agency contracts and do not involve contracts where the payments at issue under the contract were already property of the debtor. While a management agreement was the subject of the Court's opinion in In re HRC Joint Venture, 175 B.R. 948, 951 (Bankr. S.D. Oh. 1994), the Court found that the hotel management agreement was not an agency agreement and was instead an agreement "between two principals" based on the long and unique "evolution in the development in the legal

If this were not true, secured creditors with interests in rents from office buildings or retail centers that are managed by professional management companies pursuant to management contracts would not have security interests in the rents generated by these properties; rather, these amounts would be rights to payment under the management contracts, which would be personal property governed by the Uniform Commercial Code. If the Noteholders position were correct, there would not be a need for assignments of rents in deeds of trust when the real property collateral is managed by a third party management company. In reality, assignments of rents are contained in virtually every deed of trust, while assignments of management contracts are the exception, rather then the rule.

### 3. The Post Petition Cash Is Not The Proceeds Of The Gaming Devices

The Noteholders argue that they have a security interest in the Debtor's gaming devices and that the vast majority of the Post Petition Cash is the proceeds of the gaming devices. This argument fails because the revenue from the use of the gaming devices does not constitute the proceeds, product or profit of the gaming devices as those terms are used in Section 552(b). The Post Petition Cash is not created by the liquidation of assets in which the Noteholder's hold a security interest pre-petition. Rather it is created by the services provided by the Debtor and the operation of the Debtor's casino (through its agent Hyatt) on a post petition basis.

In providing for the survival of liens on the proceeds of a secured creditor's collateral under the narrow exception to the general rule invalidating liens on after acquired property, "Congress intended to extend a pre-petition lien post-petition when collateral [was] converted into new property." In re Corpus Christi Hotel Partners, Ltd., 133 B.R. 850, 856 (Bankr. S.D. Tex. 1991) (emphasis added), citing, H.R. Rep. No. 95-595, 95th Cong., 1st. Sess 377 (1977), 1978 USCCAN 5787, 6333 ("[t]he term proceeds is not limited to the technical definition of that term in the UCC, but covers any property into which property subject to the security interest is converted.").

Courts have thus held that the meaning of the term "proceeds" under Section 552(b) only includes funds derived from the sale, exchange, collection on, conversion or other disposition of collateral and does not include funds generated by the use of collateral. Corpus Christi, 133 B.R. at 856; Lykes Bros., 216 B.R. at 864; see, In re S&J Holding Corp., 42 B.R. 249, 250 (Bankr. S.D. Fla. 1984) (revenue from use of video games was not the proceeds of the video games). Indeed, if proceeds included funds generated from any use of collateral, the narrow exception set forth in Section 552(b) would swallow the rule as "arguably all post-petition funds would become proceeds." Corpus Christi, 133 B.R. at 856; Lykes Bros., 216 B.R. at 864.

The Noteholders argue that the cash generated by gaming devices is like milk from cows and cite cases holding that a creditor's lien on milk produced by cows survives Section 552(a) because milk is the product of the cow. However, the Noteholders do not

---

relationship between property owners and hotel operators." (emphasis added). Since this case involves an agreement between an agent and principal and the operation of a casino, and not a hotel, the dicta in HRC regarding contract proceeds is inapplicable.

explain how the products produced by livestock are similar to the revenue generated from the use of gaming devices. Further, courts are split on whether milk is even the product of a cow under Section 552(b). Many courts, relying on the legislative history for Section 552(b), have held that milk was not the product of the cow because the term "product" as used in Section 552(b) is limited to those instances where the nature of the creditor's collateral is transformed or converted into new property. In re Pigeon, 49 B.R. 657, 660 (Bankr. N.D. 1985); In re Jackels, 55 B.R. 67, 69 (Bankr. D.Minn. 1985).[7] [Too broad a reading of the term product would eviscerate Section 552(a) and thwart the role Congress intended to play in bankruptcies, which is to "cut off post-petition security interests in property that comes into existence by virtue of the services, wealth and resources of the debtor." Clark, Barkley, The Law of Secured Transactions Under the Uniform Commercial Code, ¶ 6.04[2][c], p. 6-64 (2002).]

As demonstrated in the Motion, revenue from the use of the gaming devices is more properly characterized as either (1) "money" that comes into being when a customer places a wager, or (2) the proceeds of a gaming or aleatory contract between the Debtor and a customer which would be an "account" or "general intangible." Whether the Post Petition Cash is money, an account or general intangible, it only comes into existence post-petition when the Debtor's customers spend money at the Casino's restaurants or place a wager at a gaming table or machine. It does not implicate any pre-petition collateral because the customer is under no pre-petition obligation to wager or dine at the Casino. See Investment Hotel Properties, 109 B.R. at 995 - 997 (holding that revenue generated from accounts receivable not in existence as of the petition date was not subject to a creditor's pre-petition security interest), and it is certainly not derived from a liquidation of collateral in which the Noteholder's held a pre-petition security interest.

Noteholders would not seriously contend that a lender with a security interest in the FF&E of a restaurant would have a lien on the post petition revenue derived from the operation of the restaurant. Yet, that situation is very analogous to the revenue derived from the Debtor's post petition of its casino.

### B. Even If The Post-Petition Cash Is Deemed To Be The Proceeds Of The Gaming Devices, The Noteholders Do Note Have A Present Security Interest In Those Gaming Devices

The Noteholders argue that they have a security interest in the Debtor's gaming devices because Colorado law does not exclude the taking of a security interest in gaming devices. However, this argument ignores the fact that under the express terms of the Noteholders' security agreements, the Noteholders do not have a security interest in any FF&E purchased with FF&E Loan until the FF&E loan has been "repaid, satisfied and terminated." It can not be disputed that the gaming devices are FF&E and were purchased by the Debtor with the proceeds of the FF&E loan obtained by the Debtor from Wells Fargo Bank.

---

[7] The First Mortgage Noteholders also assert without any analysis or authority that the revenues from gaming devices are the profits of the gaming devices. However, the court in Investment Hotel Properties held that the term "profits" under Section 552(b) only referred to the real property interest in profits. Id., 109 B.R. at 996.

Section 1.1 of the Noteholders' Deed of Trust, p. 7, attached as Exhibit F to the Motion, sets forth the assets excluded as collateral from the terms of the Deed of Trust and provides as follows:

> Notwithstanding the foregoing, the Trust Property shall not include any of the following assets (the "Excluded Assets"): (A) Gaming Licenses, (B) Liquor Licenses, (C) all gaming devices, other licenses or permits and any interest in such gaming devices, licenses or permits to the extent (but only to the extent) that the Gaming Laws or Liquor Laws, as applicable, prohibit, as of the date hereof, the Debtor from granting a security interest therein without the approval of the relevant Gaming Authority or Liquor License Authority (but only to the extent such approval has not been obtained), <u>(D) FF&E to the extent that (1) the purchase or lease for such FF&E is not financed with the proceeds of the Notes but with the proceeds of an FF&E Financing and (2) the Debtor is permitted to enter into such FF&E Financing for such FF&E under the Indenture</u> . . . provided, however, that (x) any such Excluded Asset now owned or hereafter acquired by the Debtor shall automatically become part of the Collateral when and to the extent it may subsequently be made subject to such a lien and/or such approval of the Gaming Authority or Liquor License Authority, as applicable, is obtained and/or <u>such FF&E Financing has been repaid, satisfied or terminated</u>. (emphasis added).

Section 2.9(c) of the First Mortgage Noteholders' Deed of Trust, p. 15, further emphasizes that the FF&E is an Excluded Asset under the Deed of Trust by providing that:

> This Deed of Trust, shall not extend to (i) FF&E to the extent the purchase or lease thereof has been financed or refinanced by, or with the proceeds of, an FF&E Financing permitted under the Indenture and (ii) any future or further advances made under such FF&E Financing and to any modifications, renewals, extensions or refinancings thereof to which the lien of this Deed of Trust would otherwise attach, in each case to the extent such FF&E Financing is permitted under the Indenture; provided that any such FF&E Financing shall encumber only that FF&E specifically subject to the FF&E Financing; and provided further that, upon the repayment, satisfaction or termination of such FF&E Financing, all FF&E financed thereby shall no longer be deemed an Excluded Asset and shall be subject to the lien of this Deed of Trust.

Most of the gaming devices, and all of the slot machines, were purchased, leased, financed or refinanced with the proceeds of the FF&E Loan. The FF&E Loan has not been repaid, satisfied or terminated. Since the express terms of the Noteholders' deed of trust exclude gaming devices as collateral to the extent that the gaming devices were purchased with the FF&E Loan and the FF&E Loan has not been repaid, satisfied or terminated, the Noteholders do not have a present security interest in the gaming devices.[8] Without a

---

[8] While the Second Mortgage Noteholders (Hyatt) filed a late joinder to the Objection, the Second Mortgage Noteholders' deed of trust is identical to the First Mortgage Noteholders' deed of trust with respect to provisions excluding FF&E that was purchased with the FF&E Loan as collateral under the deed of trust. Second Mortgage Holders' Deed of Trust, attached as Exhibit K to the Motion, sections 1.1, 2.7(c), pp. 7, 17.

security interest in the gaming devices, the Noteholders cannot have a security interest in the proceeds of those devices (even assuming, arguendo, that the Post Petition Cash is a proceed of the gaming devices). See, In re Carpenter and McAleer Associates, 815 F.Supp. 384, 386 (D. Colo. 1993) (holding that secured creditor could not have a perfected security interest in proceeds of an account receivable if creditor did not have a perfected interest in the account receivable itself).

II. **THE DEBTOR SHOULD BE AUTHORIZED TO USE THE PRE-PETITION AND POST-PETITION CASH IN ACCORDANCE WITH THE BUDGET BECAUSE SUCH EXPENSES ARE CONSISTENT WITH THE TYPES OF EXPENSES AUTHORIZED BY MORNING STAR**

The Noteholders requested an evidentiary hearing in order to determine whether the corporate costs in the budget presented by the Debtor in connection with the Motion ("Budget") are appropriate based on their assertion that most of the corporate costs are unnecessary because Hyatt is managing the Casino and the Noteholders can protect and preserve their own interests. As set forth above, and in the Motion, the Post Petition Cash is not the cash collateral of the Noteholders. Thus an evidentiary hearing is not necessary since a necessary predicate for the evidentiary hearing is that the Post Petition Cash is the Noteholders' cash collateral.

Even if the Post Petition Cash were deemed to be the Noteholders' cash collateral, the Court should authorize the Debtor's use of that cash collateral in accordance with the terms of the Budget. The fact that a manager is in place and that one of the secured creditors has the ability to protect its own interests does not divest a debtor of its fiduciary obligations to all creditors in the case to manage estate property, especially given Hyatt's management problems and potential conflicts of interest. As noted by the court in In re Morning Star Ranch Resorts, 64 B.R. 818, 822 (Bankr. D. Colo. 1986), the debtor is a fiduciary and operates the property for all the parties in interest and therefore could, like a receiver, use funds to pay the expenses of managing and overseeing the management of estate property:

> Further, under normal receiverships, the receiver would be paid a receiver's fee. He might, as well, hire a managing company to manage the property and pay a management fee. He might also engage accountants or attorneys in appropriate circumstances and pay their fees and expenses. All of these costs would come out of rents received before any monies would be paid over to the lender.

As noted in the Motion, the corporate costs set forth in the Budget include (1) legal expenses and oversight related to the operation of the Casino, (2) the cost for a facilities manager who provides engineering and building maintenance services, and (3) overhead and labor expenses for the Debtor's personnel who prepare all SEC filings, IRS filings and other financial reports, address regulatory compliance issues with the Colorado Division of Gaming, work with the city and the Colorado Gaming Association, review and analyze monthly financial reports required under the management agreement with Hyatt, provide necessary financial and accounting services, and manage and provide oversight for Hyatt's activities and the operation of the Casino.

The Noteholders criticize only a few of these items in order to argue that corporate costs are unnecessary. However, the Debtor's labor and overhead expenses are critical operating expenses because the primary function of the Debtor's personnel is to support the operation of the Casino. The IRS filings and financial and accounting services provided by the Debtor's personnel are primarily related to operations of the Casino as the Debtor has no other business. Further, the Debtor's personnel work directly with the Colorado Division of Gaming on regulatory compliance issues for the Casino and the Colorado Gaming Association on matters involving the Casino's operations. The Debtor's corporate costs also include the cost of a facilities manager for the Casino who provides engineering and building maintenance services. The expenses for all of these services is allowable under Morning Star as either operating expenses, management expenses or the expenses of the receiver.

The Noteholders' argument that Hyatt's management of the Casino negates the need for the Debtor's oversight and management ignores the fact that, unlike Hyatt, the Debtor functions like a receiver. As in Morning Star, the Debtor has a duty to all creditors to maintain and protect the property. Hyatt has no such direct duty and, indeed, has separate interests as a purported secured creditor, the "day to day" manager of the Casino and a party to a management agreement that the Debtor has sought to reject. Indeed, Hyatt has reserved its rights with respect to recoupment for funds in its actual or constructive possession placing it in potential conflict with other creditors and the Debtor with respect to the Cash.

It is the Debtor's personnel who have determined that the Hyatt management agreement should be rejected. It is the Debtor's personnel who have prepared a detailed transition plan. It is the Debtor's personnel who have interviewed potential candidates to become general manger of the Casino once the Hyatt management agreement has been rejected. It is the Debtor's personnel who, as a part of their oversight of the Hyatt's performance under its management agreement, have made numerous suggestions to Hyatt which, very recently, have been implemented by Hyatt, to the direct advantage of the operation of the Casino and the financial interests of the estate and its creditors.

Morningstar analogizes the role of a debtor to that of a receiver. If the logic of the Noteholders' argument were applied to a single real estate asset case in which the receiver hired a property management company to manage the real estate asset, the receiver should resign as soon as the property manager is hired, since the receiver would no longer be needed to operate the property. The fallacy in the Noteholders' argument is obvious.

Furthermore, once the Hyatt management agreement has been rejected, the Debtor's personnel will be needed to directly manage and operate the Casino. The Debtor's personnel have key licenses necessary to operate the Casino. If salaries and retention bonuses are not provided for, the Debtor could lose personnel who have (1) the experience in the gaming industry necessary to manage the Casino, and (2) the licenses necessary to operate the Casino.

The Noteholders' also argue that legal costs are unnecessary because they can defend their own interests with respect to mechanics lien litigation. This argument ignores the existence of other litigation in which the Debtor is involved, but with respect to which the Noteholders are not parties, including litigation involving the Casino's gaming license, and

624083.02 03

- 11 -

assumes that the Debtor is willing to rely on the Noteholders to protect the Debtor's interests in litigation in which both the Debtor and the Noteholders are parties. Further, as noted in the Debtor has duties to all creditors and is entitled to hire and pay counsel to defend the estate's interest in ongoing litigation involving the property. Accordingly, the Debtor should be authorized to use the Pre-Petition Cash and the Post-Petition Cash in accordance with the Budget.

### III. UNDER THE CIRCUMSTANCES, IF A DETERMINATION IS NOT MADE ON THE MOTION AT THE JANUARY 9, 2003 HEARING, INTERIM USE OF CASH COLLATERAL, ON A MINIMAL BASIS AND FOR A LIMITED PERIOD OF TIME, IS APPROPRIATE.

The Debtor filed its chapter 11 petition on November 7, 2002. The petition was filed on an emergency basis due to the appointment of a receiver, on an ex parte basis with no prior notice to the Debtor, at the behest of the Noteholders.

Upon the filing of the chapter 11 case the Debtor initiated discussions with the Noteholders with respect to a consensual use of cash collateral (although the Debtor believes that the Post Petition Cash is not the cash collateral of the Noteholders, due to the contrary position being taken by the Noteholders the Debtor deemed it appropriate to file the Motion rather than to begin to use the Post Petition Cash without a judicial determination of the issue).

Those negotiations were ultimately unsuccessful. Consequently, the Motion was served on December 5, 2002. As of January 9, 2003 the chapter 11 case will have been pending for approximately two months, during which time the Debtor has been denied any use of its Post Petition Cash.

This period of time without the use of any cash has created a severe hardship on the Debtor and its personnel Debtor has been unable to pay payroll for essential personnel, insurance premiums, rental and utilities payments on a corporate apartment in Black Hawk used by Debtor's personnel, and travel expenses for necessary travel by Debtor's personnel.

Attached as Exhibit "A" to this Reply is summary of the funds the Debtor requires immediately to avoid further hardship due to its inability to use Post Petition Cash until a final hearing is held on the Motion.

The amount of funds requested are almost negligible in the context of the Debtor's revenue from operations, operating expenses and debt structure. The Debtor requests that on a one time basis, without prejudice to the positions taken by any of the parties with respect to the issues raised by the Motion, the Court authorize the use of the Debtor's Post Petition Cash to fund the items listed on Exhibit "A".

Dated: January 9, 2003

Respectfully Submitted,

RUBNER PADJEN AND LAUFER LLC

By: _____
Paul D. Rubner, Esq. (#1261)
Joel Laufer, Esq. (#7728)
Robert Padjen, Esq. (#14678)
Attorneys for Debtor and Debtor-in-Possession
1600 Broadway, Suite 2600
Denver, Colorado 80202
Telephone (303) 830-3172
Facsimile (303) 830-3135

and

IRELL & MANELLA LLP
William N. Lobel, Esq. (Cal. Bar # 093202)
Jeffrey M. Reisner, Esq. (Cal. Bar # 143715)
Attorneys for Debtor and Debtor-in-Possession
840 Newport Center Drive, Suite 400
Newport Beach, California 92660
Telephone (949) 760-0991
Facsimile (949) 760-5200

Windsor Woodmont Black Hawk Resort Corp.
Request For Use of Funds

| | |
|---|---:|
| Payroll For Period From 11/7/02 - 12/31/02 | 68,893.32 |
| Payroll Taxes for Payroll above | 5,270.34 |
| ADP Payroll processing fees - est. | 100.00 |
| Health Insurance Premium - January | 2,486.66 |
| Auto Insurance - Progressive | 551.28 |
| Pinnacol -Workers Comp. Insurance Premium - January | 385.00 |
| Apartment Rent - January | 1,441.00 |
| Apartment Utilities (post petition): | |
|   Xcel Energy | 78.01 |
|   AT&T Broadband | 37.98 |
|   Qwest | 147.82 |
| Office Utilities (post petition): | |
|   Qwest | 222.29 |
|   Broadwing | 69.31 |
|   AT&T | 59.73 |
| Executive Travel - Deposit for post petition travel | 4,000.00 |
| Total Funding Request | 83,742.74 |

Exhibit A

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| WINDSOR WOODMONT BLACK | ) | Case No. 02-28089-ABC |
| HAWK RESORT CORPORATION, | ) | |
| a/k/a the Black Hawk Casino by Hyatt, | ) | |
| a Colorado corporation, | ) | |
| | ) | |
| EIN 75-2720870, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 9, 2003, a copy of the Reply To First Mortgage Noteholders' Objection To The Debtor's Motion For Use Of Cash In Ordinary Course Of Business And For Authority To Use Cash Collateral was served by overnight mail on the parties set forth in Exhibit A attached hereto and was also served electronically or by facsimile on those parties designated with ** on Exhibit A Attached hereto.

_____
Joel Laufer

Windsor Woodmont Black Hawk Special Notice Matrix

**Debtors:**
Michael Armstrong
Windsor Woodmont Black Hawk Resort
111 Richman Street
Black Hawk, CO 80422

**Counsel for the Debtors**
Jeffrey M. Reisner/Tavi C. Flanagan
Irell & Manella LLP
840 Newport Center Drive, Ste. 400
Newport Beach, CA 92660

**Counsel for Debtors**
Paul D. Rubner/Joel Laufer
Rubner Padjen and Laufer LLC
1600 Broadway, Suite 2600
Denver, CO 80202

**Office of the US Trustee**
Joanne C. Speirs
U. S. Trustee
999 18th Street, Suite 1551
Denver, CO 80202

**List of 20 Largest**
Coloardo Dept. of Revenue
1375 Sherman Street
Denver, CO 80203

**List of 20 Largest**
Sullivan & Associates
Attn: Craig Sullivan
12 Isleworth Drive
Henderson, NV 89012

**List of 20 Largest**
Premium Financing Specialists
P. O. Box 90819
Austin, TX 78709-0819

**List of 20 Largest**
Paul Hastings Janofsky & Walker
Attn: Rick S. Kirkbride
555 S. Flower Street, 23rd Floor
Los Angeles, CA 90071

**List of 20 Largest**
US Foods
Dept 597
Denver, CO 80271

**List of 20 Largest**
Denver Newspaper Agency
Dept. 485
Denver, CO 80281

**List of 20 Largest**
International Game Technology
301 Commercial Road
Golden, CO 80401

**List of 20 Largest**
Paul Steelman Interiors
Attn: Paul Steelman
3330 West Desert Inn Road
Las Vegas, NV 89102

**List of 20 Largest**
Parker Blake, Inc.
Attn: Tim Patterson
7012 S. Revere Pkwy., Ste. 120
Englewood, CO 80112

**List of 20 Largest**
WMS Gaming
800 S. Northpoint Blvd.
Waukegan, IL 60085

**List of 20 Largest**
Nobel/Sysco Food Services Co.
1101 W.48th Avenue
Denver, CO 80221

**List of 20 Largest**
Global Payments
P. O. Box 66700
Chicago, IL 60666-0700

**List of 20 Largest**
Anchor Games
Dept. 7866
Los Angeles, CA 90088-7866

**List of 20 Largest**
American Express
Attn: Customer Service
P.O. Box 297812
Ft. Lauderdale, FL 33329-7812

**List of 20 Largest**
KXKL-FM Radio
1560 Broadway, Suite 1100
Denver, CO 80202-5144

**List of 20 Largest**
Metro-North Newspapers
P.O. Box 350070
Westminster, CO 80035

**List of 20 Largest**
TYCO/Fire & Security/SimplexGrinnell
Dept CH 10320
Palatine, IL 60055-0320

**List of 20 Largest**
Jefferson-Pilot Communications
KYGO-FM Radio
1095 S.Monaco Parkway
Denver, CO 80224

**List of 20 Largest**
Clear Channel Colorado
3936 Collections Center Drive
Chicago, IL 60693

**List of 20 Largest**
Good Signs
Attn: Mitzzi D. Wineland
14985 W. 52nd Avenue
Golden, CO 80403

**Request for Notice**
Mark L. Fulford, Esq.
Sherman & Howard
633 17th Street, Suite 3000
Denver, CO 80202

**Request for Notice**
Ceri Williams, Esq.
Colorado Division of Gaming
Business & Licensing Section
1525 Sherman Street, 5th Floor
Denver, CO 80203-1760

**Request for Notice**
Lisa K. Mayers, Esq.
Grimshaw & Harring PC
1700 Lincoln Street, Suite 3800
Denver, CO 80203

EXHIBIT A

Windsor Woodmont Black Hawk Special Notice Matrix

| | | |
|---|---|---|
| **Request for Notice** ** <br> J. Wasserman/H. Sender/B. Bond <br> Sender & Wasserman PC <br> 1999 Broadway, Suite 2305 <br> Denver, CO 80202 | **Request for Notice** <br> H. Farbes/M. Pankow/D. Garfield <br> Brownstein, Hyatt & Farber <br> 410 17th Street, Suite 2200 <br> Denver, CO 80202-4004 | **List of 20 Largest** <br> Excel Energy <br> P O Box 840 <br> Denver, CO 80201 |
| **Request for Notice** ** <br> Warren S. Bloom, Esq. <br> Nabors, Gibline & Nickerson <br> CNL Center, Suite 510 <br> 480 S. Orange Avenue <br> Orlando, FL 32801 | James T. Markus, Esq. ** <br> 1700 Lincoln Street, Suite 3550 <br> Denver, CO 80203 | **List of 20 Largest** <br> GA Wright <br> 4105 Holly Street <br> Denver, CO 80216 |
| **Request for Notice** ** <br> M. Cook/J. Beck <br> Schulte Roth & Zabel <br> 919 Third Avenue <br> New York, NY 10022 | **Counsel for Hyatt** ** <br> D. Heller/P. Knight <br> Latham & Watkins <br> 233 South Wacker Drive <br> Sears Tower #5800 <br> Chicago, IL 60606 | **List of 20 Largest** <br> Jet Lithocard <br> P O Box 77-5611 <br> Chicago, IL 60678-5611 |
| **Request for Notice** ** <br> C. Christensen/H. Lewis <br> Lindquist & Vennum <br> 600 17th Street, Suite 1800-S <br> Denver, CO 80202 | **Counsel for D. Belding** ** <br> Steve Harris, Esq. <br> Belding Harris & Petroni <br> 417 W. Plumb Lane <br> Reno, NV 89509 | **List of 20 Largest** <br> Market Smart <br> 6372 McLeod Dr., Ste. 3 <br> Las Vegas, NV 89120 |
| **Request for Notice** <br> Steven W. Kelly, Esq. <br> Silver & DeBoskey <br> 1801 York Street <br> Denver, CO 80206 | Wells Fargo Bank NA <br> Attn: Rochanne Hackett <br> 5340 KietzkeLane <br> Reno, NV 895111 | **List of 20 Largest** <br> Holley Albertsosn & Polk <br> 1667 Cole Blvd., Suite 100, Bldg. 9 <br> Golden, CO 80401-3313 |
| **Request for Notice** <br> Daniel A. Hepner, Esq. <br> Lirtzman Nehls & Hepner PC <br> 190 Arapahoe Avenue <br> Boulder, CO 80302 | Black Hawk B.I.D. <br> c/o Paul Goedecke <br> 950 Wadsworth Blvd., Ste. 204 <br> Lakewood, CO 80215 | **List of 20 Largest** <br> Viacom Outdoor <br> P O Box 100920 <br> Pasadena, CA 91189-0920 |
| **Claimant** <br> Compton Dancer Consulting Inc. <br> 3690 S. Eastern Avenue, Suite 213 <br> Las Vegas, NV 89109-3377 | **List of 20 Largest** <br> Lombardi Brothers Meats <br> 135 LaSalle Dept. 3810 <br> Chicago, IL 60674-3810 | **Counsel for City of Black Hawk** <br> Gorsuch Kirgis LLP <br> Attn: Charles F. McVay, Esq. <br> 1515 Arapahoe St., Ste. 1000 <br> Denver, CO 80202 |